**UNITED STATES of America, Plaintiff-Appellee,**

**v.**

**Marvin Ray HUFFMAN, Defendant-Appellant.**

**No. 72–1013.**

United States Court of Appeals, Sixth Circuit.

Sept. 13, 1972.

William T. Warner, Louisville, Ky., for defendant-appellant.

James H. Barr, Asst. U. S. Atty., George J. Long, U. S. Atty., W. Waverley Townes, Asst. U. S. Atty., Louisville, Ky., on brief, for plaintiff-appellee.

Before WEICK, PECK and McCREE, Circuit Judges.

McCREE, Circuit Judge.

This is an appeal from a jury conviction on three counts of an indictment charging that Huffman mailed three letters which threatened the lives of the President and Vice President of the United States, in violation of 18 U.S.C. § 871(a).[1] The District Court sentenced Huffman to imprisonment for three concurrent five-year terms pursuant to 18 U.S.C. § 4208(a)(2).

Appellant contends that the evidence does not support the jury's determination that he possessed the requisite criminal intent; that the jury instruction on intent was erroneous; and that the court did not give counsel an opportunity to object to its instructions after they had been given and before the jury had begun its deliberations as required by Rule 30 of the Federal Rules of Criminal Procedure. Appellant does not deny that he wrote and mailed the letters.

We conclude that the instructions were erroneous and that the court failed to comply with Rule 30. Accordingly, we reverse the conviction and remand the case for a new trial.

Appellant is a man of below average intelligence, and an avowed homosexual. It is undisputed that he has a history of mental disorders and that he was under emotional stress and was deeply disturbed at the time he wrote these letters. He also has a history of repeated criminal activity. He was previously convicted in North Carolina of writing a threatening letter to the President, and as a result of that conviction, he was transferred from a state prison to a federal prison. At the time he wrote the letters for which he was indicted here, he was confined by the United States Army in the stockade at Fort Knox, Kentucky, for having been absent without leave.

During his incarceration at Fort Knox, he was confined, for a period, to a psychiatric ward in Ireland Army Hospital because he had intentionally cut his own wrists three times in the stockade. He characterizes these incidents as suicide attempts, but appellee contends that the cuts were superficial and were intended only to procure his release from the stockade.

The letters were written during June 1971. The first letter, dated June 18, 1971, was addressed to the Vice President and stated that Huffman would kill him if the Vice President did not have Huffman released from the Army within 14 days and did not provide him with

---

1. 18 U.S.C. § 871(a) provides:

Whoever knowingly and willfully deposits for conveyance in the mail or for a delivery from any post office or by any letter carrier any letter, paper, writing, print, missive, or document containing any threat to take the life of or to inflict bodily harm upon the President of the United States, the President-elect, the Vice President or other officer next in the order of succession to the office of President of the United States, or the Vice President-elect, or knowingly and willfully otherwise makes any such threat against the President, President-elect, Vice President or other officer next in the order of succession to the office of President, or Vice President-elect, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

$100,000 in 20 and 50 dollar bills.[2] The second letter, dated June 21, 1971, was addressed to the President. It informed him that Huffman had made plans to kill the Vice President and that he had decided to kill the President two days before killing the Vice President.[3] The third letter, dated June 27, 1971, was addressed to the President and stated that Huffman had "made up his mind" to kill the President pursuant to a plan whereby Huffman would become the owner of "at least one-half of the United States." The letter also threatened the lives of the President's daughter, the Secretary of State, the Secretary of the Interior, J. Edgar Hoover (the Director of the Federal Bureau of Investigation), and the Vice President. It further stated that Huffman intended to undergo a sex change and to become the first woman President of the United States.[4]

At trial, Huffman's only defense was that he was suffering from a mental disturbance at the time he wrote the letters, and that it was so serious that he did not know what he was doing and could not conform his conduct to the re-

2. June 18, 1971

Vice-President Spiro T. Agnew
White House, Washington, D. C.

Dear Sir:

I am being held at Fort Knox stockade. I have been here for about a month. I have been in the prisons in Kentucky, North Carolina, Florida. Since you are Number Two in command over the U. S. Army you seem like a very smart man so I know you do not want me to kill you. Now, if you don't want me to kill you, you will do as I say.

1. You will get me out of the Army within 14 days from today this 18th day of June, of the year 1971. That will give you about 12 days after you get this letter.

2. You will get me $100,000.00 and send it to me in 20, 50 dollar bills and you better do it quite [sic].

3. You will get the money from the bank, and do not let anyone see you because anything ————— you better understand your life depends on it. Get it?

4. One final thought that you do it and you do it dam quite [sic]. You know 14 days is not very long to live.
Now to tell you a little about myself, I am 21 years old, very ————— 6 feet 1 inch tall. I wear a size 10 ladies ————— and size 14 ladies blouse. My hair looks just like a woman does, and I would love to kill you. You will live if you do as this letter, and if you don't you will die. My address is Marvin Ray Huffman, U.S. 67079661, Post Stockade, Post Office Box A Fort Knox, Kentucky.

My cell number, South K Cell.
(s) Marvin Ray Huffman

3. 21 June, 1971

Mr. Richard Nixon, President of the U.S.A.

White House, Washington, D.C.

Dear sir. I am writing this letter to inform you that I have made plans to kill Vice-President Agnew but since I have thought about it a little I have decided to kill you two days before I kill Agnew. This should make you feeling good to know that you will have about 6 to 8 day to live before I kill you. The reason I am going to wait two days before I kill President—kill President Agnew is so he can watch them through [sic] you in a hole knowing this—that time can be counted in hours on his toe. Just remember you are to die and I will get all the praise for it.

Marvin R. Huffman. My gay name, Joanne.

4. 27 June, 1971

Richard Nixon,
President of the United States
White House, Washington, D.C.

Dear Sir:

I have just made up my mind to kill you in the next ten day and kill your daughter in ten day after you are dead and then—and then let about 50 or 60 of my boys be put in some of the high places in Washington and then very soon I will be able to start my great plan of being the owner of at least one-half of the United States. But of course I will have the following named men killed:

You, the Secretary of State, Secretary of Interior, J. Edgar Hoover, and, of course, I will take care of all the gold out of Fort Knox and just think with all of you killed plus Vice-President killed and the same as I get my sex changed

quirements of the law.[5]   In support of this defense, he submitted the testimony of a psychologist, Dr. Curtis L. Barrett, Jr., who had administered several tests of different types to Huffman and had interviewed him twice, on one occasion for about four hours.   In rebuttal, the Government submitted the testimony of a psychiatrist, Dr. John D. Trawick, Jr., who had interviewed Huffman at the Jefferson County Jail on August 25, 1971, for a period of "somewhat over an hour."   The principal purpose of Dr. Trawick's interview with Huffman was to determine competency to stand trial, but Dr. Trawick testified that he was also able to form some conclusions about Huffman's mental state two months earlier.

Both parties submitted written requests for jury instructions on insanity as a defense.   In his written request, the Assistant United States Attorney asserted that he followed our decision in United States v. Smith, 404 F.2d 720 (6th Cir. 1968).   In that case we expressed approval of the standards of the American Law Institute stated in its Model Penal Code § 4.01 (Official Draft, 1962)[6]:

> We now elect generally to adhere to the test of criminal responsibility [stated in] the Model Penal Code. We believe it to be a test which a jury will readily comprehend; one which

comports with and makes available modern scientific knowledge and one which may serve to aid the continuing development of the federal law.

The questions for jury consideration pertaining to criminal responsibility when defendant offers an insanity defense are as follows:

1.   Was he suffering from a mental illness at the time of the commission of the crime?

2.   Was that illness such as to prevent his knowing the wrongfulness of his act?

3.   Was the mental illness such as to render him substantially incapable of conforming his conduct to the requirements of the law he is charged with violating?

A negative finding as to the first question or negative findings as to both the second and third questions would require rejection of the insanity defense.   An affirmative finding as to the first question, plus an affirmative finding as to either the second or the third question, would require a jury verdict of "not guilty" because of defendant's lack of criminal responsibility.

If in the judgment of the court the lay and psychiatric testimony provides no issue in relation to the second

---

I will not be homosexual any more but a woman, the very first woman President of the United States and you fools can't did a dam thing to stop me.

The sweet boy, or I think I should say the sweetest little woman in Fort Knox Stockade, Marvin Ray Huffman.
          (s) Marvin Joanne Huffman

5.   This court has only recently held, in United States v. Lincoln, 462 F.2d 1368 (6th Cir. 1972), that 18 U.S.C. § 871(a) requires:

   only that the defendant intentionally make a statement, written or oral, in a context or under such circumstances wherein a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of an intention to inflict

bodily harm upon or to take the life of the President, and that the statement not be the result of mistake, duress, or coercion.   The statute does not require that the defendant actually intend to carry out the threat.

Id. at 1369 (quoting from Roy v. United States, 416 F.2d 874, 877–878 (9th Cir. 1969)).

6.   In the Model Penal Code the ALI formulated this test:

   A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of the law.   Model Penal Code § 4.01 (Official Draft, 1962).

question, there is no need to submit it to the jury.

We emphasize that by approving the ALI standard and by setting forth the questions above we are not seeking to require judicial instructions in these specific words.

But we specifically stated in a footnote that we did not adopt an additional definition endorsed by the ALI:

We do not, however, adopt the following additional definition endorsed by the ALI: *"As used in this Article, the terms 'mental disease or defect' do not include any abnormality manifested only by repeated criminal or otherwise anti-social conduct."* Model Penal Code § 4.01(2) (Official Draft, 1962). The purpose of this definitional sentence was obviously to exclude from the definition of insanity "psychopathic personalities" who demonstrate mental abnormality principally by habitual violation of the law. The ALI commentators argue that to date mental health facilities in this nation offer little hope for curative treatment of these persons, and that mental health facilities are already overburdened by patients as to whom the prospects for successful treatment are considerably brighter. There is, however, great dispute over the psychiatric soundness of section 4.01(2). See Overholser, Criminal Responsibility: A Psychiatrist's Viewpoint, 48 A.B.A. J. 527, 530 (1962); Diamond, From M'Naghten to Currens, and Beyond, 50 Calif.L.Rev. 189, 193–194 (1962).

*Smith, supra,* 404 F.2d at 727 n.8 (emphasis added). *Cf.,* United States v. Brawner, 471 F.2d 969 at 992–994 (D.C. Cir. 1972).

■ Nevertheless, the Assistant United States Attorney's request included this rejected definition:

As used in these instructions, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

And the court erroneously delivered this instruction to the jury. This was plain error which requires reversal of the conviction and remand for a new trial despite appellant's failure to state distinctly his objection to it. Fed.R.Crim.P. 52(b). *See* Screws v. United States, 325 U.S. 91, 107, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); United States v. Krosky, 418 F.2d 65, 66 (6th Cir. 1969). This is so because the instruction foreclosed the jury from considering whether Huffman's homosexuality and anti-social behavior were manifestations of a mental disease or defect which might have prevented him from knowing the wrongfulness of his act or have rendered him substantially incapable of conforming his conduct to the requirements of the law. It is clear that this was a theory of the defense, because defense counsel's closing argument to the jury included the following statement:

Now, you heard Doctor Barrett's testimony. . . . And his opinion was, as you heard, that this man, because of the circumstances he was in at the time the letters were written, did not have the mental capacity necessary to form this intent which the Government must prove.

．　．　．　．　．　．

Doctor Trawick admitted that the acts that you've heard here during the day were the acts of a deeply disturbed person. And, believe me, I think that common sense will dictate to all of us that you don't have to be either a psychologist or a psychiatrist to figure out that a man who does the things that this man has done is in any respects a normal individual.

■ We observe that compliance with Rule 30 might have made reversal unnecessary because it would have afforded the trial court the opportunity of correcting this error in its charge before the jury began its deliberations. The rule provides, in part:

No party may assign as error any portion of the charge or omission

therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury.

In this case, the following proceedings occurred after the court delivered its instructions:

BY THE COURT:

. . . . . .

Now, any—any request for any further instructions?

All of the jury must agree—any objections or exceptions?

MR. WARNER [defense counsel] : May I approach the bench? I've got one or two points. Are we going to argue that now?

BY THE COURT: We can go ahead and take them up while they're out.

MR. WARNER: All right.

The court then gave the jury forms on which to return its verdicts, and proceeded as follows:

BY THE COURT:

. . . . . .

You may take them to their room, Mr. Marshal. And you may adjourn court till the jury returns.

(WHEREUPON, AT ABOUT THE HOUR OF 4:30 P.M. THE JURY RETIRED TO BEGIN ITS DELIBERATIONS AND THE FOLLOWING PROCEEDINGS OCCURRED IN CHAMBERS).

MR. WARNER: Judge, I've got one —two specific objections to the instructions as given.

. . . . . .

The other objection I have, sir, is again based on our discussion in chambers previously that I don't feel that the instructions which were given relative to the mental issue adequately covered the related issue of diminished capacity. I think there is too much in there about sanity and insanity, and I feel that we were entitled, or we are entitled, to have the jury instructed specifically on that issue as tendered in my instructions.

MR. TOWNES: I disagree. As I said earlier, I think that it was redundant. I feel that the instructions set out the issues that were presented to the jury, and I feel they were in accordance with the procedure set out by the Sixth Circuit.

BY THE COURT: Okay.

MR. WARNER: That's all I have, Your Honor.

BY THE COURT: Okay. Overruled.

(WHEREUPON, AT ABOUT THE HOUR OF 4:50 P.M. THE JURY RETURNED TO THE COURTROOM AND THE FOLLOWING PROCEEDINGS OCCURRED IN OPEN COURT).

[The jury returned its verdicts of guilty.]

This procedure frustrated the purpose of the rule to provide an opportunity for the court to make corrections before the jury begins deliberations. See 2 Wright, Federal Practice and Procedure § 484, at 284 n.35 & n.36; 8 J. Moore, Federal Practice ¶30.04, and cases cited therein. Since the jury had already begun to deliberate, counsel may have considered the opportunity to make objections meaningless because the court would have been understandably reluctant to recall the jury to amend or correct its instructions. It is also possible that any correction would have come too late—after the jury had reached a conclusion about the issue affected by the erroneous instruction.

██ The judgment of conviction is vacated, and the case is remanded for retrial in accordance with this opinion. Upon retrial, after the jury has been instructed, and before it begins deliberating, counsel must be permitted to object on the record, to the instructions, as given, out of the hearing of the jury. Upon request, counsel must be permitted to make objection out of the presence of

the jury.[7] One preferred procedure for a District Court to follow after completing its instructions is to excuse the jury with the admonition not to begin its deliberations until it is instructed to do so. Then, in the absence of the jury, counsel may be asked to state any objections and to make any requests for corrections or additional instructions. With the jury absent, counsel may argue for suggested changes without risking alienation of the jury. When the judge has decided the matter, he may direct the jury to begin its deliberations either with or without supplemental instructions.[8]

Reversed and remanded.

WEICK, Circuit Judge (dissenting).

It was not controverted that Huffman did indeed write and mail the letters to the President and Vice President of the United States, threatening to kill them and the President's daughter, and threatening to have killed the Secretaries of State and Interior and J. Edgar Hoover, and making demands for the payment of large sums of money.

Huffman's only defense was insanity, and the proof on this issue was sharply in dispute. A psychologist testified for Huffman, and a psychiatrist testified for the Government. Huffman was an admitted homosexual and had a criminal record, but this does not constitute proof of insanity. The District Court properly submitted to the jury the issue of insanity. The jury was not impressed with Huffman's insanity defense, and found him guilty on all three counts of the indictment. The Court does not question that the verdict is supported by substantial evidence. Huffman had been convicted previously and had served a prison sentence for threatening the life of the President of the United States.

This Court nevertheless is reversing the judgment of conviction and is granting a new trial on two grounds, each of which, as I will point out, is purely technical and has no substance.

First, the majority opinion states:

" . . . [T]he court did not give counsel an opportunity to object to its instructions after they had been given and before the jury had begun its deliberations as required by Rule 30 of the Federal Rules of Criminal Procedure." [1]

---

7. In 1966, Rule 30 was amended to provide an opportunity for objection out of the *presence* of the jury upon request by any party. The Notes of the Advisory Committee on Rules state that this provision was intended "to permit full argument of objections to instructions."

8. We observe that the Courts of Appeals are sharply divided over the issue whether prejudice must be shown to require reversal of a conviction obtained in a proceeding not in compliance with Rule 30. *Compare* United States v. Slaton, 430 F.2d 1109, 1111 (7th Cir. 1970) (rehearing en banc denied), cert. denied, 400 U.S. 997, 91 S.Ct. 475, 27 L.Ed.2d 448 (1971) ; Carbo v. United States, 314 F.2d 718, 745–746 (9th Cir. 1963) (rehearing denied), cert. denied, 377 U.S. 953, 84 S.Ct. 1626, 12 L.Ed.2d 498 (1964) ; *and* Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732, 744 (9th Cir. 1954), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954) ; *with* Hall v. United States, 378 F.2d 349 (10th Cir. 1967) ; Dunn v. St. Louis-

San Francisco Ry. Co., 370 F.2d 681, 683–684 (10th Cir. 1966) ; *and* United States v. Schartner, 426 F.2d 470, 479 (3d Cir. 1970). Since we are not required to decide this issue in this case, we decline to do so.

1. Rule 30, Fed.R.Crim.P. provides:

"At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adverse parties. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Oppor-

This claim is refuted by the record from which the Court quotes in its opinion:

"In this case the following proceedings occurred after the court delivered its instructions:

By the Court:

.    .    .    .    .    .

Now, any—any request for any further instructions?

All of the jury must agree—any objections or exceptions?

Mr. Warner [defense counsel]: May I approach the bench? I've got one or two points. Are we going to argue that now?

By the Court: We can go ahead and take them up while they're out.

Mr. Warner: All right."

It thus appears that counsel for defendant did ask the Court for permission to approach the bench, stating that he had one or two points. He further asked, "Are we going to argue that now?" The Court replied, "We can go ahead and take them up while they're out." Defendant's counsel agreed by stating, "All right." He made no objection to that procedure, but on the contrary agreed to it.

Rule 51 of Federal Rules of Criminal Procedure requires that a party make "known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor . . . ." McNeely v. United States, 353 F.2d 913 (8th Cir. 1965); Petro v. United States, 210 F.2d 49 (6th Cir. 1954), cert. denied, 347 U.S. 978, 74 S.Ct. 790, 98 L.Ed. 1116 (1964).

Counsel did make known to the Court his acquiescence in and agreement with the action which the Court was taking by replying, "All right." He never made an objection thereto.

The second alleged error is that the Court in giving an otherwise perfect instruction on insanity under the ALI rule adopted by a panel of this Court in United States v. Smith, 404 F.2d 720 (6th Cir. 1968), instructed the jury further as follows:

"As used in these instructions, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct."

This instruction correctly embodied Section 4.01(2) of the Official Draft of the ALI Model Penal Code, (1962). However, in *Smith*, after adopting the Code, the panel in footnote 8 stated:

"8 We do, however, adopt the following additional definition endorsed by the ALI: 'As used in this Article, the terms "mental disease or defect" do not include any abnormality manifested only by repeated criminal or otherwise anti-social conduct.' Model Penal Code § 4.01(2) (Official Draft, 1962). The purpose of this definitional sentence was obviously to exclude from the definition of insanity 'psychopathic personalities' who demonstrate mental abnormality principally by habitual violation of the law. The ALI commentators argue that to date mental health facilities in this nation offer little hope for curative treatment of these persons, and that mental health facilities are already overburdened by patients as to whom the prospects for successful treatment are considerably brighter. There is, however, great dispute over the psychiatric soundness of section 4.01(2). See Overholser, Criminal Responsibility: A Psychiatrist's Viewpoint, 48 A. B.A.J. 527, 530 (1962), Diamond, From M'Naghten to Currens, and Beyond, 50 Calif.L.Rev. 189, 193–94 (1962)." (*Id.* at 727).

The defendant did not call to the attention of the District Court at any time the fact that footnote 8 of *Smith* did not adopt Section 4.01(2) of the ALI Model

tunity shall be given to make the objection out of the hearing of the jury and, on request of any party, out of the presence of the jury." As amended Feb. 28, 1966, eff. July 1, 1966.

Penal Code, and the Court was given no opportunity to correct the instruction which he had given to the jury.

Rule 30 is clear that—

"No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

Defendant made no such objection, either before or after the jury returned to conduct its deliberations.

While the jury was still deliberating, the following did take place, as quoted in the Court's opinion:

"Mr. Warner: Judge, I've got one —two specific objections to the instructions as given.

. . .

The other objection I have, sir, is again based on our discussion in chambers previously that I don't feel that the instructions which were given relative to the mental issue adequately covered the related issue of diminished capacity. I think there is too much in there about sanity and insanity, and I feel that we were entitled, or we are entitled, to have the jury instructed specifically on that issue as tendered in my instructions."

It is clear that these objections did not call to the Court's attention anything concerning the instruction on Section 4.01(2) of the ALI Model Penal Code. Defendant was complaining only that the Court did not give his special requests, and he was asking the Court to give them. The Court previously had refused to give such requests in the language employed by defendant, although part of them were given in the general charge. These requests are contained in footnote 2.[2]

---

2. Comes now the Defendant, Marvin Ray Huffman, by his counsel, and, pursuant to Rule 30, Federal Rules of Criminal Procedure, requests the Court to instruct the jury on the law in this case as follows:

1. "To constitute the crime charged in the indictment, there must be a joint operation of two essential elements, an act forbidden by law and an intent to do the act.

"Before Defendant may be found guilty of a crime the prosecution must establish, beyond a reasonable doubt, that under the Statute described in these instructions, Defendant was forbidden to do the act charged in the indictment, and that he intentionally committed the act.

"The crime charged in this case is a serious crime which requires proof of specific intent before the Defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent, the Government must prove that Defendant knowingly did an act which the law forbids, purposefully intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.

"An act or a failure to act is 'knowingly' done, if done voluntarily and intentionally, and not because of some other reason.

"If the evidence in the case should leave you with a reasonable doubt, whether at the time and place of the alleged offense, the accused acted, or failed to act, was forced, in effect, to commit the crime charged in the indictment by coercion or compulsion, then you should acquit the accused.

2. "Under the Defendant's plea of 'not guilty' there is an issue as to his sanity at the time of the alleged offense. The law does not hold a person criminally accountable for his conduct while insane, since an insane person is not capable of forming the intent essential to the commission of a crime.

"The sanity of the Defendant at the time of the commission of the alleged offenses, is an element of the crime charged and must be established by the Government beyond reasonable doubt, just as it must establish every other element of the offense charged.

"A Defendant is insane within the meaning of these instructions, if, at the time of the alleged criminal conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the lawfulness of his conduct or to conform his conduct to the requirements of law.

"Notwithstanding the fact that one accused of committing a crime may have been able to comprehend the nature and

In his brief, counsel for appellant states:

"Finally, while the Court discussed both sets of tendered instructions with counsel during a recess in the trial before the jury was instructed, and indicated that the defendant's instructions, as tendered, were to be rejected, counsel for defendant was given no opportunity to state or argue his objections to the instructions as *actually given by the Court*, before the jury began its deliberations, as required by Rule 30, Federal Rules of Criminal Procedure [T. of E., pp. 208–210]." (Brief, p. 17).

It is clear from this statement that counsel was fully advised by the Court that his requests for instructions were rejected, but he is now complaining that he was given no opportunity to again argue them before the jury began its deliberations. As I have previously pointed out, he consented to argue the matter after submission. None of the requests dealt with Section 4.01(2) of the Model Code.

In his brief, in stating the issues presented for review as required by Rule 28(a)(2) Federal R.App.P., appellant stated:

"I. Did the trial court err in failing and refusing to give an instruction with respect to specific intent as requested by the defendant-appellant?

"II. Did the trial court err in failing and refusing to give an instruction with respect to diminished capacity or irresistible impulse as requested by the defendant-appellant?

"III. Was the evidence presented to the jury sufficient, as a matter of law, to permit the jury reasonably to have found the defendant-appellant criminally responsible?"

It is submitted that none of these issues relate to Section 4.01(2) of the Model Code and the defendant made no such claim in his brief as ground for reversal.

A brief comment on footnote 8 in *Smith*. The footnote states: "There is, however, a great dispute over the psychiatric soundness of section 4.01(2)." In support of this statement two articles by psychiatrists are cited. No legal authority is cited holding that this ALI section is not a sound statement of the law.

I hope the day has not yet arrived when any abnormality manifested only by repeated criminal or otherwise antisocial conduct will be considered as a mental disease or defect, proof of which will be a defense to a criminal charge.

consequences of his act, and to know that it was wrong, nevertheless, if he was forced to its execution by an impulse which he was powerless to control, in consequence of a mental disease or defect, he will be acquitted.

"A person accused of a crime is not responsible unless he had sufficient will power to control his impulse to commit the act charged.

"For the purpose of throwing light upon the mental condition of the accused at the time of the alleged offense, the jury may consider evidence of his mental state both before and after the time. The material issue, however, is whether the Defendant was sane or insane at the time of the alleged criminal conduct.

"Temporary insanity, as well as insanity of longer duration, is recognized by the law.

"If the evidence in the case leaves you with a reasonable doubt as to whether the Defendant was sane at the time of alleged offense, you will find him not guilty, even though it may appear that he was sane at earlier and later times.

3. "Where a Defendant has raised the issue of his insanity, and the jury finds from the evidence in the case beyond a reasonable doubt that the accused was not insane at the time of the alleged offense, it is still the duty of the jury to consider all the evidence in the case which may aid determination of state of mind, including all evidence offered on the issue as to insanity, in order to determine whether the Defendant acted or failed to act with specific intent, as charged.

"If the evidence in the case leaves the jury with a reasonable doubt whether the mind of the accused was capable of forming, or did form, specific intent to commit the crime charged, the jury should acquit the accused."

If such were ever permitted, a rapist, a burglar, robber, thief, molester of children, and a murderer would have a complete defense merely by proving that he committed such antisocial acts in the past to establish his insanity.

Footnote 8 in *Smith* does not hold that it is prejudicial error for a Court to charge on Section 4.01(2).

In my opinion, it was proper and was not plain error to charge on Section 4.-01(2). The rule which permits but does not require the Court to notice plain errors not brought to the attention of the District Court, was not intended to destroy Rule 30. United States v. Graydon, 429 F.2d 120 (4th Cir. 1970).

I would affirm the judgment of the District Court.