**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Florencia Y. WALKER (92–3135) and
Tanya M. Powell (92–3136),
Defendants–Appellants.**

**Nos. 92–3135, 92–3136.**

United States Court of Appeals,
Sixth Circuit.

Argued March 1, 1993.

Decided July 29, 1993.

Rehearing Denied Sept. 23, 1993.

Robyn Jones (briefed) and Salvador A. Dominguez (argued), Office of the U.S. Atty., Columbus, OH, for plaintiff-appellee.

Richard A. Cline (argued and briefed), Mitchell, Allen, Catalano & Boda, Columbus, OH, for defendant-appellant.

Before: KEITH and BATCHELDER, Circuit Judges; and CHURCHILL, Senior District Judge.*

CHURCHILL, Senior District Judge.

On December 5, 1989 a grand jury in the Southern District of Ohio, Eastern Division, returned a complex 46-page indictment charging the appellants, Tanya M. Powell and Florencia Y. Walker, along with four other named defendants, with a variety of offenses.

Powell and Walker, and the other four defendants, were charged in Count 1 with conspiracy to import heroin in violation of 21 U.S.C. § 963.

Count 24 charged Powell and Walker with importation of heroin in violation of 21 U.S.C. § 952(a), 21 U.S.C. §§ 960(a)(1) and (b)(1)(A) and 18 U.S.C. § 2.

Counts 23 and 29 charged Walker with traveling in interstate commerce in furtherance of a racketeering enterprise in violation of 18 U.S.C. § 1952 and 2.

In Count 31, Walker was charged with attempted importation of heroin, in violation of 21 U.S.C. § 963.

---

* The Honorable James P. Churchill, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

Powell was charged in Counts 8, 20, 25, 27 and 28 with traveling in interstate commerce in furtherance of a racketeering enterprise in violation of 18 U.S.C. §§ 1952 and 2.

Powell and one other defendant were charged in Count 9 with possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii) and 18 U.S.C. § 2.

Powell and defendants other than Walker were charged in Counts 19, 21 and 30 with importation of heroin in violation of 21 U.S.C. §§ 952(a) and 960(a)(1) and 18 U.S.C. § 2.

Count 34 charged Powell and defendants other than Walker with conspiracy to distribute and possess with intent to distribute heroin in violation of 21 U.S.C. § 846.

Forfeiture Count J alleged that Powell acquired a 1987 Volvo in the name of Conchita Branch and that the automobile was obtained as a result of the commission of a felony in violation of 21 U.S.C. § 853(a)(1).

The Count 1 conspiracy was alleged to have occurred between October, 1984 and September, 1988. The other alleged offenses were alleged to have occurred on various dates during the period of the Count 1 conspiracy.

Walker and Powell were arrested on March 8, 1990. At the arraignment on March 27, not guilty pleas were entered and trial was scheduled to commence on May 2. On April 4 they were released on bond.

Three potential government witnesses— Brenda Givens, Joyce Crawford and Halima Isa—were named in Count 1 as unindicted co-conspirators. Givens, Crawford and Isa, prior to and during the trial, were imprisoned in Japan for violations of Japanese narcotics laws. The Japanese government refused to allow any of them to leave Japan. The government sought and obtained, over objections, leave of the court to take their depositions in Japan. Two trips to Japan were necessary to take the depositions because the witnesses refused to testify without grants of immunity. The government also sought and obtained trial continuances because of the time involved in taking depositions in Japan.

Major portions of the video tape depositions were objected to by one or more parties. Prior to the trial, the Court made rulings as to those portions of the tapes which would be inadmissible. The inadmissible portions were deleted from a copy of the tapes.

For convenience, a transcript of the video tape depositions had been prepared. Those portions of the testimony which were ruled to be inadmissible were highlighted with a yellow marker.

Before commencement of the trial, Walker moved for a separate trial because she was not charged with the offenses involving cocaine. Her motion was denied.

Jury trial of the charges against four of the defendants, Walker, Powell, Brown and Butler, commenced on April 29, 1991.

Jury selection was still in progress on May 6. Early in the day, Brown entered a guilty plea and agreed to testify for the government. The other three defendants moved to dismiss the venire. Later in the day, Butler also entered a guilty plea. The next morning the court denied the motions and instructed the jury that they should draw no inference from the fact that the trial was proceeding against only two defendants.

Because of the pleas, additional portions of the transcripts were highlighted and additional portions of the video tapes were deleted.

The government, over objection, was allowed to and did use the modified video tape copies to present the testimony of the three missing witnesses. Neither the tapes nor the tape copies were admitted as exhibits. The transcripts were not admitted into evidence.

At the close of proofs, Count 19 was dismissed.

In the late afternoon of May 28, the jury retired for the sole purpose of selecting a foreperson. Trial was recessed until 9:15 a.m. on May 29 at which time the trial exhibits were given to the jury. At approximately 2:00 p.m., the jury sent out written questions which included the following question:

ARE THE WRITTEN TRANSCRIPTS EXACTLY THE SAME AS WHAT WE HEARD FROM THE VIDEO TAPES OR HAVE PARTS BEEN EDITED OUT? SPECIFICALLY, BRENDA GIVENS' DEPOSITION RE: THE COCAINE TRANSACTION THAT ALLEGEDLY TOOK PLACE IN TANYA'S HOUSE (PAGES I–114 THRU I–116).

An on-the-record inquiry of the foreperson of the jury established that the book of transcripts of the depositions, highlights and all, had been inadvertently sent into the jury room along with the admitted exhibits. Defendants then moved for a mistrial.

Following the questioning of jurors individually, the defendants' motions for mistrials were denied.

On May 30 the jury returned verdicts of guilty as to each defendant on all remaining counts. The defendants' bonds were revoked.

On January 29, 1992, Powell was sentenced to 264 months in prison with five years' supervised release. On the same day, Walker was sentenced to 169 months in prison with five years' supervised release. Timely notices of appeal were filed.

### Issues on Appeal

Both of the appellants raise as issues on appeal (1) denial of their Sixth Amendment rights of confrontation of the deposed witnesses, (2) error in denial of their motions for mistrial because the jury had access to and actually read substantial portions of the transcripts, and (3) error because the appellants were not present during the questioning of the individual jurors.

Additionally, appellant Walker raises the following issues:

(1) Denial of statutory right to a speedy trial in violation of 18 U.S.C. § 3161.

(2) Error in denial of her motion for a separate trial.

(3) Error in failure to discharge the venire when Brown and Butler pled guilty.

(4) Error in denying a two-level reduction in her base offense level pursuant to U.S.S.G. § 3B1.2 because she played a minor role in the offense.

### The Speedy Trial Act Claim

■ Appellant Walker claims that the Court erred in denial of her motion to dismiss for failure to commence her trial within the statutory 70–day period, citing only 18 U.S.C. § 3161. The record reveals that the government overcame a series of logistical and legal problems, not of its own making, in taking depositions of important witnesses in Japan. The court found that continuing the trial from May 2, 1990 to October 22, 1990, and from October 22, 1990 to February 4, 1991, and finally from February 4, 1991 to April 29, 1991 was necessary because witnesses were absent or unavailable for trial and that the periods of delay were excludable in computing the time within which trial must be commenced pursuant to 18 U.S.C. § 3161(h)(3)(A). The court specifically found that the ends of justice served by such continuances outweighed the interests of the public and the defendants in a speedy trial, 18 U.S.C. § 3161(h)(8)(A). We find no error in these determinations.

### The Guidelines Claim

■ Appellant Walker's argument assumes the facts alleged by the government. She argues that she was less culpable than other defendants and that she was entitled to a two-level reduction of her base offense level for minor role pursuant to U.S.S.G. § 3B1.2(b).

The government's version of her role was that she readily agreed to be a courier for the purpose of making money. She made two trips from the United States to Japan for the purpose of bringing back large quantities of heroin. For the first trip she received approximately $14,000. On the second trip she was promised to be paid at least $15,000 for her services as a courier.

■ In a purely domestic distribution operation couriers, even of large quantities of a controlled substances, may frequently be minor participants. When the crime is importation, however, couriers play a role that is central to the offense. *United States v.*

*Buenrostro,* 868 F.2d 135, 137 (5th Cir.1989), *cert. denied,* 495 U.S. 923, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990).

Her role was not significantly less culpable than that of other couriers. The fact that she was less culpable than "organizers, leaders, managers or supervisors" does not establish that the defendant was a minor participant.

The Court did not err in refusing to reduce her offense level by two points.

### The Separate Trial and Jury Venire Issues

■ Citing no authority, Appellant Walker argues that the Court erred when it denied her motion to sever her trial from that of her sister, codefendant Powell. Walker also argues that the error was compounded when the Court denied the motion to dismiss the jury venire after codefendants Brown and Butler pled guilty during the jury selection process.

The morning after Brown and Butler pled guilty, the court gave the jury the following precautionary instruction:

> You will see by looking at counsel table for the defendants that there are now two defendants rather than four, two lawyers representing their respective clients, there are therefore three less lawyers at the table representing two defendants. Let me advise you right now, I will advise those of you who are seated as jurors in the case, that you are not to draw any inference from that. It is a matter that does not concern you at all and you are not to draw any inference.

We find no error in the procedure used by the court.

■ Powell was charged with offenses in 12 counts, some of which related to the conspiracy to import heroin, but others related to a conspiracy to possess with intent to distribute cocaine. Walker was not charged in the cocaine related counts.

The motion for severance, like the motion to strike the jury venire, was addressed to the court's discretion.

■ Evidence of one crime or a series of crimes must be related to the others. *United States v. Hatcher,* 680 F.2d 438 (6th Cir. 1982). There was a factual relationship between the cocaine and heroin related crimes.

Brown testified concerning the cocaine conspiracy. Immediately following Brown's direct testimony, the court gave the jury the following instruction:

> Ladies and gentlemen of the jury, during the course of this testimony you may have heard testimony by Mr. Brown that related to allegations of the conspiracy to sell cocaine. You are instructed that Florencia Walker is not charged with involvement in this alleged conspiracy. You may not use evidence relating to an alleged conspiracy to sell cocaine in your deliberations of the charges against Florencia Walker.

Appellant Walker was not denied a fair trial by the manner in which the court dealt with either motion.

### The Confrontation Issue

■ The government took reasonable steps to enable the appellants to attend the taking of depositions in Japan without being arrested. The United States government requested from the Japanese government a formal guarantee that the defendants would not be prosecuted in Japan for past conduct. The Japanese government denied the request.

Fearing prosecution in Japan, Walker and Powell elected not to attend the taking of the depositions. Their reluctance to go to Japan was well founded. Walker had previously been arrested and detained for several weeks in Japan. The American witnesses in Japan may well have given Japanese authorities information which would provide a basis for prosecuting the appellants in Japan. For the purpose of ruling on their Sixth Amendment claims it may be assumed that they were effectively prohibited from going to Japan, but also that the United States government was not responsible for the prohibition.

Walker's attorney and Powell's attorney were present when the depositions were taken and were given the opportunity to cross-examine the witnesses.

In *United States v. Sines,* 761 F.2d 1434 (9th Cir.1985), the Ninth Circuit was confronted with a similar situation. In *Sines* the deposed witness, Steneman, was serving a long prison sentence in Thailand. Sines chose not to attend the deposition because he was afraid he might be arrested there on narcotic trafficking charges. The court rejected the confrontation argument stating:

> Sines' confrontation cross claim is similarly without merit. The Supreme Court has identified the major purpose of the confrontation clause as: (1) ensuring that witnesses will testify under oath; (2) for enforcing witnesses to undergo cross-examination; (3) permitting the jury to observe the demeanor of witnesses. *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970); *accord, Mancusi v. Stubbs,* 408 U.S. 204, 213 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293 (1972). All three of these purposes were fulfilled when Steneman's deposition was taken with Sines' attorney present. *See, United States v. King,* [552 F.2d 833, 842 (9th Cir.1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977) ] (focusing upon ability of defense counsel to investigate case as opposed to defendants' [sic] ).

761 F.2d at 1441.

We follow the Ninth Circuit on this issue. We are of the opinion that, under the circumstances of this case, the taking of the depositions in Japan and their use in the trial did not violate the appellants' Sixth Amendment rights of confrontation.

The District Court order authorizing the taking of the depositions required that the oaths be given by a consular officer of the United States. Appellant Walker's brief suggests that the record fails to disclose that the oath administered by the consular official, Ms. Smith, was administered within her consular district. The record on appeal does not disclose when and before whom this claim was first made nor is it otherwise documented. Under these circumstances, the argument does not merit consideration.

## Denial of Motion for Mistrial

■ In *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Supreme Court prescribed that a certain procedure be followed when there is an unauthorized private communication or contact with the jury. Narrowly construed, this would not include a situation, as here, in which a document was inadvertently given to the jury by court personnel. However, in *United States v. Cooper,* 868 F.2d 1505 (6th Cir.), *cert. denied,* 490 U.S. 1094, 109 S.Ct. 2440, 104 L.Ed.2d 996 (1988), the United States Attorney's notes on the defendant's final argument found their way into the jury room. This was treated as a communication requiring the court to conduct a *Remmer* hearing.

■ It is the communication's potential to impact upon a juror's ability to perform his or her duties impartially, rather than the form or source of the communication, that dictates the necessity for conducting a *Remmer* hearing.

At first blush, the greatest risk to a fair trial from exposure to the transcripts to the jury was in the highlighted material which had been redacted from the copies of the video tapes which were shown to the jury at the trial. The court found that there was no prejudicial material therein and that, in any event, there was a "very, very strong probability" that none of the jurors had read the highlighted objections and testimony.[1] It does not appear that the appellants quarrel with these conclusions.

It was and is the jury's double or even greater exposure to selected portions of the testimony of Crawford and Givens that has been the center of the appellants' concerns. This concern was emphasized by counsel for the defendants at the time of their initial motions for mistrial after receiving the foreman's note and again in a hastily prepared brief submitted to the court before the court questioned the jurors individually. In this brief, counsel for Ms. Walker said:

> In this case, witness credibility is the entire defense case to the jury. As it relates to Ms. Walker, the entire argument to the jury was that the only testimony against

1. They had read enough to recognize it as forbid- den fruit.

Ms. Walker was that of Crawford and Givens, whom the defense argues are not worthy of belief. We now know that the jury has improperly read unredacted testimony of both of those witnesses. In fact, the jury question shows that there is a conflict between the transcripts and at least one juror's recollection of the testimony. We cannot know if any of the other jurors, while silently reading this unredacted transcript, resolved other conflicts between the transcript and the juror's recollection of testimony by resorting to the transcript.

The potential for double exposure to selected testimony to improperly influence a jury has long been recognized.

In *United States v. Padin,* 787 F.2d 1071 (6th Cir.), cert. denied, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986), the Court held that a District Court's decision to have testimony read back to a jury is governed by a discretion standard. In upholding discretion not to permit "read back" the Court, at page 1076 stated:

> Reported cases recognize two inherent dangers in reading testimony to a jury during its deliberations. First, undue emphasis may be accorded such testimony. *United States v. Varsalona,* 710 F.2d 418, 421 (8th Cir.1983); *United States v. Nolan,* 700 F.2d 479, 486 (9th Cir.), cert. denied, 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983). Second, the limited testimony that is reviewed may be taken out of context by the jury. *See, e.g., Government of Canal Zone v. Scott,* 502 F.2d 566, 570 (5th Cir.1974). In *Henry v. United States,* 204 F.2d 817 (6th Cir.1953), this circuit noted that these concerns are escalated after the jury had reported its inability to arrive at a verdict.

The fact that unauthorized and uncontrolled "read back" occurred in this case was clear from the brief testimony of the foreperson of the jury. It created a substantial potential for undue emphasis and a special hazard that limited testimony might be taken out of context.

It is the opinion of the Court that under the circumstances the court had a duty to conduct a *Remmer* hearing.

In *Remmer,* the court prescribed the procedures to be followed:

> The trial court should ... *determine the circumstances, the impact thereof upon the juror and whether or not it was prejudicial,* in a hearing with all interested parties permitted to participate.

*Remmer,* 347 U.S. at 229–30, 74 S.Ct. at 451 (emphasis added).

After consulting with counsel, the court, in chambers with counsel present, questioned the jurors individually to ascertain how the transcript had been used by the jury.[2]

The court did not inquire of the jurors whether their experience with the transcripts had influenced their ability to be fair jurors. One juror, when excused from questioning, volunteered, "Please don't declare a mistrial, we have tried so hard."

Based upon juror responses the court found that some, but not all, jurors had read portions of the transcripts that reflected evidence which had been admitted in the form of video tapes.

In addition to finding that the jurors had not read the highlighted material, the court stated, "Further, the Court finds that there is no reasonable possibility that the improperly submitted transcripts would prejudice either defendant, therefore the motions for a new trial are overruled."

The court informed counsel that it would give the jury a precautionary instruction. Before the jury was brought back, one of the defense attorneys suggested asking the jurors if their exposure to the transcripts would make them feel that they could no longer be fair and impartial. The attorney for the government opined that to do so would be opening Pandora's box. The court discarded the suggestion.

---

**2.** The appellants did not object during the proceedings to the fact that the jurors were interrogated in their absence. Although it would have been better for them to have been present, there was no prejudicial error. *See United States v. Giacalone,* 588 F.2d 1158 (6th Cir.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979).

The jury was then given the following instruction.

THE COURT: Inadvertently a written copy of the videotaped testimony was included with those items of evidence which were sent back with you in the jury room for your consideration. This was not the fault of anyone. The Court assumes control of all exhibits and takes full responsibility for the error.

You are not to give any greater weight to the testimony of those witnesses over any other testimony or evidence simply because you may have had an opportunity to view a portion of the written transcripts. As previously instructed, you are to rely upon your collective memories of the testimony and your own personal notes. You must not and should not consider in any way anything you may have read in the written transcripts. These transcripts are not part of the evidence and cannot be considered.

I will now ask you to continue your deliberations.

■ Prior to 1982, it seems to have been the consistently applied rule that, upon exposure to a jury to a potentially prejudicial communication, it was the government's burden to prove that the jury had not been biased by the communication. Since *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), however, there has been a split among the federal circuits with respect to the burden of proof.

■ In *United States v. Zelinka*, 862 F.2d 92, 95–96 (6th Cir.1988), the issue was reviewed:

This court has consistently held that *Smith v. Phillips* reinterpreted *Remmer* to shift the burden of showing bias to the defendant rather than placing a heavy burden on the government to show that an unauthorized contact was harmless. In *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985), this court interpreted *Smith v. Phillips* as holding that "*Remmer* does not govern the question of the burden of proof where potential jury partiality is alleged. Instead, *Rem-*

*mer* only controls the question of how the district court should proceed where such allegations are made. . . . In light of *Phillips*, the burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality. Prejudice is not to be presumed." (Footnote omitted).

This court has reiterated its interpretation of *Smith v. Phillips* in later cases. *E.g.*, *United States v. Howard*, 752 F.2d 220, 223–24 (6th Cir.), *cert. denied, sub nom. Shelton v. United States*, 472 U.S. 1029, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985); *United States v. Griffith*, 756 F.2d 1244, 1252 (6th Cir.), *cert. denied*, 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985). The First Circuit appears to agree with this interpretation. See *Neron v. Tierney*, 841 F.2d 1197, 1200 (1st Cir.1988); *United States v. DeLutis*, 722 F.2d 902, 909 (1st Cir.1983). On the other hand, at least two courts of appeals have expressly disagreed with *Pennell*. See *United States v. Butler*, 822 F.2d 1191, 1195 n. 2 (D.C.Cir.1987); *United States v. Littlefield*, 752 F.2d 1429, 1431 (9th Cir.1985). Other courts continue to apply *Remmer* as if *Smith v. Phillips* made no change in the burden of proof. Nevertheless, *Pennell* remains the controlling decision in this circuit.

The court in *Pennell* also noted the Supreme Court's rejection in *Smith v. Phillips* of the idea that a juror's testimony about her own impartiality is inherently suspect. 737 F.2d at 533. Four points emerge from our decision in *Pennell:* (1) when a defendant alleges that an unauthorized contact with a juror has tainted a trial, a hearing must be held; (2) no presumption of prejudice arises from such a contact; (3) the defendant bears the burden of proving actual juror bias; and (4) juror testimony at the "*Remmer* hearing" is not inherently suspect.

862 F.2d at 95–96.

By denying the reasonable request to inquire into the jurors' states of mind, the defendants were deprived of the opportunity to meet their burden of proving actual juror bias, and were thereby denied a fair trial.

The case will be **remanded** for a new trial.

BATCHELDER, Circuit Judge, concurring in part and dissenting in part, and from the judgment.

I agree in large measure with the majority's disposition of the issues here, and will not discuss that with which I agree. However, I have trouble with my colleagues' analysis on a few points, most notably with regard to the propriety of the District Court's handling of the transcripts which found their way into the jury room. Because I reach a different conclusion on that difficult issue, on which the majority's decision to grant a new trial hinged, I respectfully dissent from the court's judgment.

### 1. Denial of motion for mistrial.

While appellants do, I think, argue that the jurors were prejudiced by their having read or "at least [been] exposed to" the yellow-highlighted portions of the transcript, I agree with the majority that appellants' main argument for mistrial is that the jurors were prejudiced by their "double exposure" to the deposition testimony. I believe, however, that the District Court properly questioned the jurors as to this exposure, that the defense lawyers did not object to the *voir dire* or request the court to ask additional questions, and that the court adequately instructed the jury on the matter. Therefore, I see no abuse of discretion in the District Court's finding that the jurors' impartiality had not been tainted by exposure to the transcript.

Defendants argue incorrectly that we should consider the transcripts as akin to "extraneous," "extrinsic," or "inadmissible" material, exposure to which creates a serious question of the jury's impartiality due to our system of limiting carefully the information presented to the jury for its consideration. The Government does not dispute that six of the twelve jurors apparently read parts of the deposition transcripts of two key witnesses against defendants, Brenda Givens and Joyce Crawford. "In reading from the transcripts," defendants argue, "these six jurors, and those six jurors who watched [them] read from the transcript, were able to perceive a greater credibility and reliability from those witnesses than they might have otherwise received...." Thus, I believe the issue boils down to whether this extra exposure to deposition testimony which had been admitted in evidence resulted in "actual prejudice" on the part of the jurors.

The presence of deposition transcripts in a jury room does not necessarily infect jurors with bias; the court may permit the jury to have transcripts of taped testimony for their reference during deliberations. *United States v. Williford*, 764 F.2d 1493, 1503 (11th Cir.1985). "Absent [defendant's] showing that the transcripts were inaccurate or that specific prejudice occurred, there is no error in allowing transcripts to go to the jury room." *Id.* The decision to admit into evidence transcripts of taped testimony or conversations, or to send transcripts to the jury for their reference, falls within the sound discretion of the trial court. *United States v. West*, 948 F.2d 1042, 1044 (6th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1209, 117 L.Ed.2d 447 (1992). Had the Government requested that properly redacted[1] transcripts be placed in the jury room, we would review the District Court's decision only for abuse of discretion; I cannot fathom why we would apply stricter scrutiny to the present circumstances.

Admittedly, the transcripts mistakenly placed in the jury room in this case were not in evidence. However, even where the jury is exposed to completely extraneous material or information, we do not presume juror prejudice to result. *United States v. Pennell*, 737 F.2d 521, 532 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985) (following *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)).[2] In moving for a mistrial, the

---

1. In my view, the majority improperly accepts the appellants' factual contentions as to whether the jurors read highlighted portions of transcript. In conducting the *Remmer* hearing, the District Court found that of the six jurors who had read portions of the transcript, none had read from the highlighted sections, the jurors apparently having recognized that the highlighting indicated testimony not admitted. The record supports this finding by the District Court. I discuss this issue at greater length below.

2. I confess surprise to see the majority reach its conclusion after quoting at length from *United States v. Zelinka*, 862 F.2d 92 (6th Cir.1988), which stresses the point I make here, that we

defendant bears the burden of proving that such exposure resulted in actual prejudice, bias or partiality. *Id.* We review the District Court's decision regarding motions for mistrial only for abuse of discretion. *United States v. Griffith,* 756 F.2d 1244, 1252 (6th Cir.), *cert. denied,* 474 U.S. 837, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985).

Here, to its credit, the District Court proceeded with an abundance of caution once it found out about the transcripts, holding a *Remmer* hearing to determine what had happened and whether the jury's impartiality had possibly suffered as a result. However, the majority concludes that an unfair trial resulted when the District Court "den[ied] a reasonable request to inquire into the jurors' states of mind [and thus] deprived [defendants] of the opportunity to meet their burden of proving actual juror bias." Op. at 431. I think the majority has both misstated and mischaracterized the facts of what happened during the *Remmer* hearing.

Once the problem had manifested itself, and counsel for both sides had submitted arguments (including Walker's motion for mistrial), the judge met with counsel in a conference room and proposed to ask the jurors each four questions, out of the presence of the other jurors:

1. Have you read anything?
2. If so, what did you read?
3. If any of the transcripts were read, did you read any of the highlighted in yellow?
4. If so, what did you read?

Jury Deliberations Transcript (JD) 35. The judge specifically asked whether any of the lawyers had "any other suggestions on the type of *voir dire* or the specific questions." *Id.* Defense counsel made no objection to the questions, nor did they request that any additional questions be asked. Mr. Cline, Walker's lawyer, agreed that the four questions were "appropriate," adding only his "concern ... whether the responses to those might lead to further questions." He stated, "[W]e may have a situation where it would be appropriate to ask that particular juror to step outside while we all discuss." [sic] *Id.* at 39.

The jurors each were brought into the conference room, shown the transcript, and asked the four questions. Mr. Mellot, the first juror, said he had "looked at" Givens's testimony; he said he did not read from the highlighted portions because "we figured for some reason we weren't supposed to look at that." JD–40. Juror Farmer said he (she?) had read from Givens's testimony aloud, but had not read from the highlighted portions. JD–46. Juror Wheeler also said he (she?) had read part of Givens's testimony, but had not read any highlighted transcript. JD–49. Juror Chess said he had read parts of the transcript, but had not read highlighted text. JD–50. Juror Connolly said she had not read anything in the transcript, but noted that one juror had "made the point, you know, I don't think we should read anything in yellow." JD–52. Juror Sprague also stated that she had not read any of the transcript, and said that the other jurors thought they "were not to see" the highlighted portions. JD–53. Juror Patricia A. Holley answered similarly, JD–55, as did Juror Patricia Holley.[3] Juror Potts, evidently a bit more agitated than the others, denied reading from the transcript, and said, upon being questioned as to the highlighting, "we did not read the yellow part, I can tell you. I can promise you we did not read the yellow part." As he exited, he pleaded, "Please don't declare a mistrial; we have tried so hard." JD–58. Juror Wood also denied reading the transcript; she also recalled the jurors' discussion of the highlighted portions, and the comment of one juror that "it was probably excluded." JD–59. Juror Hoskins

have not strayed from *Smith v. Phillips,* as applied in *Pennell,* in placing the burden of proving prejudice squarely on defendants. However, as I already mentioned, and shall discuss further below, I do not see this case as one in which the jurors were exposed to "extrinsic evidence" or "unauthorized contact." Inasmuch as the cases are factually distinguishable on this point, the presumption described in *Zelinka* and *Pennell* supports my position all the more strongly.

3. This is not a result of computer malfunction; this jury included two women with the same name. The record distinguishes between them by including the middle initial of Patricia A. Holley.

said she did not read the transcript, but said that she "saw the yellow lines" but had not read the highlighted text. JD–60–61. Jury foreperson Andrews stated he read from the Givens testimony, but had not read any of the highlighted portion; he, too, recounted a discussion amongst the jurors about the significance of the highlighted text, but said that "we noted it and we assumed that it didn't pertain to what we were deliberating about." JD–62.

Several times during the *voir dire*, between jurors, the court asked if counsel had questions or comments, and specifically asked the lawyers whether any of them wanted additional questions posed to the jurors; neither defense lawyer objected, commented, or asked for additional questions. After questioning the jurors, Judge Smith commented that "the only material that was considered was the testimony that had been already admitted and shown in the videotaped depositions," and that there was "a very, very strong probability that the jurors did not in fact consider the information." JD–63. The court then asked for comments from counsel. The Government agreed with Judge Smith's comments, asserting that any testimony the jurors had read was cumulative and arguing against declaring a mistrial. JD–64. Mr. Thomas, Powell's lawyer, cited two cases holding that "extraneous material in the jury room is reversible error." *Id.* Mr. Cline pointed out that some of the transcript had been read aloud, and argued that

> [e]ven if the Court's ruling is correct, that they did not consider the yellow highlighted portions, nor read any of those portions, it is the position of the defense that the ability to review the testimony of individualized witnesses in general is very dangerous and it is reversible error. But particularly so in a case like this where the defense contends that the critical factor in determination of Florencia Walker's innocence or guilt is a determination of credibility of Brenda Givens and Joyce Crawford.

JD–65. Judge Smith then denied the motion for mistrial, finding only a "slight potential" that any of the jurors had read from the highlighted portions of transcript, and holding that no prejudice to the defendants resulted from either this possibility or from the jurors' having read from the transcript of admitted videotaped testimony. JD–66. The court also indicated that it would issue an instruction to the jury on the matter. *Id.*

Mr. Cline then asked whether "the whole process of questioning the jurors and so forth, or their exposure to [the transcript], in any way makes any of them feel that they could no longer be a fair and impartial juror." JD–70. One of the government lawyers commented that in light of the court's intention to issue an instruction, asking further questions would "open[ ] Pandora's box." *Id.* Cline then stressed that he did not know whether asking further questions would be "necessary," but stated, "I raise it so we can discuss it." *Id.* The judge responded that "once we give them an explanation ... and give them a further instruction that they are not to consider it, I think that's the best way to do it." *Id.* Defense counsel made no further comments or objections, and the discussion ended. Immediately thereafter, Judge Smith reconvened the jury in the courtroom and issued the instruction to the jury which the majority has quoted above.

To make a proper objection considered preserved for purposes of appeal, Fed. R.Evid. 51 counsel must, "at the time the ruling or order of the court is made or sought, make[ ] known to the court the action which that party desires the court to take or that party's objection to the action of the court and the grounds therefor...." *See United States v. Huffman*, 467 F.2d 189, 196 (6th Cir.1972). Counsel must "object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection." *United States v. Fendley*, 522 F.2d 181, 186 (5th Cir.1975) (*quoted in United States v. LeBlanc*, 612 F.2d 1012, 1014 (6th Cir.), *cert. denied*, 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980)). Even where defense counsel makes a request for a jury *voir dire* in order to make a showing of actual prejudice, he must object to preserve the issue on appeal if the court does not rule specifically on his request. *United States v. Williams*, 809 F.2d 75, 84 (1st Cir.1986), *cert. denied*,

481 U.S. 1030, 1072, 107 S.Ct. 1959, 2469, 95 L.Ed.2d 531, 877; 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 377 (1987). The Rules of Evidence do not require "formal" objections per se; "[t]he general rule requiring counsel to make clear to the trial court what action they wish taken should not be applied in a ritualistic fashion." Charles A. Wright, 3A *Federal Practice and Procedure* § 842 at 289 (1982). However, both counsel's position and the trial court's ruling must be "clear" from the record; the problem must be "brought to the attention of the court, *and* the court [must have] indicated in no uncertain terms what its views are...." *United States v. Pirovolos,* 844 F.2d 415, 424 n. 8 (7th Cir.), *cert. denied,* 488 U.S. 857, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988) (quoting Wright, *Federal Practice and Procedure* § 842) (emphasis added). *See also King v. Jones,* 824 F.2d 324, 326 (4th Cir.1987) (under Fed.R.Civ.P. 46, the civil counterpart of Fed.R.Evid. 51, "[i]f there are particular *voir dire* questions which counsel deems essential, and that refusal to ask them may be reversible error, counsel must so advise the court, and state his reasons before the court's *voir dire* ... is completed").

The majority characterizes as a full-blown objection Mr. Cline's brief discussion with the court as to whether the *voir dire* questions sufficiently drew out any feelings on the part of the jurors with regard to their continuing impartiality, and characterizes the court's response that the jury instruction would be "the best way to do it" as a "den[ial]" of Cline's "reasonable request to inquire into the jurors' states of mind." In my view, and, I think, under the law of this Circuit and others as I have described it, Cline's comments cannot even be construed as a request to make inquiry, let alone an objection. At the time, Cline stressed that he did not know whether the law required that further questions be asked, but simply stated that he wished to "raise it so we can discuss it." The judge did not directly respond to Cline's thoughts, but reiterated his

belief that the jury instruction would suffice to cure the problem. Cline did not pursue the issue, saying nothing once Judge Smith had made his comments. At that point, it was clear that the judge intended to walk right back to the courtroom, call in the jury and issue the instruction; no further *voir dire* would take place. Had Cline wished a different course, he had the right, and the opportunity, to make his objection clear. His lack of any response to the judge's final comments indicates to me that he waived any objection.[4]

For the purposes of argument, I shall retreat to the next trench and assume not only that Cline made a proper objection to the *voir dire* and specifically requested that the court make particular inquiry into the jurors' assessment of their own impartiality, but also that the court denied Cline's request. To make these assumptions, I believe, does not change the result. I stress that we may review this denial only for abuse of discretion. Traditionally, decisions regarding the conduct of *voir dire* fall within the sound discretion of the judge. For example, the court may decide, as it did in this case, to prohibit counsel from participating in the questioning. *See* Fed.R.Civ.P. 24(a). With regard to appellate review of the trial court's handling of the jury, the Supreme Court has observed:

> Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review. The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial. Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions. In neither instance can an appellate court easily second-guess the conclusions of the decisionmaker who heard and observed the witnesses.

*Rosales–Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981). The Court noted the "ample discre-

---

4. I also note that since counsel and the judge were alone in the conference room, there can be no suggestion that Cline may have been reluctant to press his "objection" because of the jury's presence. Some courts have seen such reluc-

tance as excusable in that situation, and held the objection not to be waived. *See* Wright, *Federal Practice and Procedure* § 842 n. 12 and accompanying text.

tion" accorded Federal judges "in determining how best to conduct the *voir dire*," and restated its longstanding rule that "'the court [has] broad discretion as to the questions to be asked.'" *Id.* at 189, 101 S.Ct. at 1634 (quoting *Aldridge v. United States*, 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931)). This Circuit has cleaved to this principle of deference. *See United States v. Fish*, 928 F.2d 185, 186 (6th Cir.1991) ("[j]udges need not use every question submitted by counsel").

While *Rosales–Lopez* and certain of the other cases I have cited arose from the context of jury selection *voir dire*, the "abuse of discretion" standard of review, and, I think, the principles underlying that standard, apply as well to *voir dire* conducted during the trial to determine the continuing impartiality of the jurors. In *United States v. Sababu*, 891 F.2d 1308 (7th Cir.1989), a transcript of a taped phone conversation, which the court had excluded since the tape was "largely inaudible," found its way into the jury room, and certain of the jurors had reviewed it. 891 F.2d at 1333. The judge asked counsel to draft a curative instruction, and soon instructed the jury that the transcript was "not in evidence.... You must disregard this transcript entirely and continue your deliberations." *Id.* Defense counsel nonetheless demanded a mistrial, and asked that the court "conduct a *voir dire* of the jury to probe the effect of the transcript on their deliberations." *Id.* The prosecution objected, arguing that questioning the jurors specifically "might give undue significance to the transcript." *Id.* The court refused to conduct the *voir dire*.

The Seventh Circuit affirmed the District Court's decision. The court noted that jury exposure to material not in evidence is handled on a case-by-case basis; "[t]he district court has the primary responsibility for making this determination of prejudice, and an appellate court must review [it] ... under an 'abuse of discretion' standard." *Sababu*, 891 F.2d at 1333. In explaining this deferential standard, the court observed:

> "The district court will always be in a better position than the appellate judges to assess the probable reactions of jurors in a

case over which he has presided. As we cannot put ourselves in the district judge's shoes in these matters we ought to accept his judgment unless we have a very strong conviction of error."

*Id.* (quoting *United States v. Bruscino*, 687 F.2d 938, 941 (7th Cir.1982) (en banc), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1205, 75 L.Ed.2d 446 (1983)). Since "other ample evidence" existed against defendant, since the contents of the transcript were not weighty, inflammatory on their face, nor had they been explained to the jury by counsel, and since the jury is presumed to follow the court's curative instructions, the court concluded that "there was no 'reasonable possibility' that the transcript affected the verdict." *Id.* at 1334. The District Court, therefore, having "'broad discretion to remedy prejudicial influences,'" *id.* (quoting *United States v. Williams*, 737 F.2d 594, 613 (7th Cir.1984)), did not, in the view of the Seventh Circuit, "abuse its discretion in refusing defendant's request that he question the jury," *id.*

If the *Sababu* decision was correct, then *a fortiori* the majority here has erred, in my opinion. The jury there had read from a transcript of a tape the court had excluded from evidence, not from a transcript of a videotaped deposition which had been admitted and which the jury had seen, as here. In general, where the overwhelming bulk of admissible evidence supports a conviction, the introduction of improper but cumulative evidence is harmless error. *Harrington v. California*, 395 U.S. 250, 254, 89 S.Ct. 1726, 1728–29, 23 L.Ed.2d 284 (1969). Where a document, erroneously present in the jury room during deliberations, is "merely cumulative of other, properly admitted evidence, the transmittal is harmless error." *United States v. Treadwell*, 760 F.2d 327, 339 (D.C.Cir.1985), *cert. denied*, 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). More importantly, defense counsel in *Sababu* had specifically requested that the court conduct a *voir dire*, and the court had expressly denied defendant's objection.

As I have discussed, I do not believe Judge Smith could reasonably have read into Mr. Cline's comments a demand for further ques-

tioning of the jury. Judge Smith also acted properly in issuing a thoughtful curative instruction, which the law presumes the jurors understood and followed, in the absence of evidence to the contrary. *United States v. Zalman,* 870 F.2d 1047, 1053 (6th Cir.), *cert. denied,* 492 U.S. 921, 109 S.Ct. 3248, 106 L.Ed.2d 594 (1989). And in any event, I see nothing in the record to support the majority's apparent conclusions that the defendants sustained their burden of demonstrating actual prejudice and that Judge Smith's positive assessment of the jurors' continuing impartiality was erroneous. In light of that record, to give weight to Juror Potts's comment that "we have tried so hard" or to accept defendants' insinuation that the jurors "had read enough [of the highlighted portions of transcript] to recognize it as forbidden fruit" in the face of twelve jurors' swearing before the court that they had not, strikes me both as trammeling the discretion of the trial court without warrant and minimizing beyond recognition the defendant's burden on the issue of actual juror prejudice. I would affirm Judge Smith's denial of defendants' motion for mistrial.

2. *Objections to the foreign depositions.*

While I concur with the majority's rejection of defendants' objections with regard to the depositions taken in Japan, I wish to clarify three points. First, I note that the majority observes, in commencing its discussion of defendants' confrontation clause challenge, that "[t]he [United States] government took reasonable steps to enable the appellants to attend the taking of depositions in Japan without being arrested." Op. at 428. While this statement is true as a matter of fact, I am concerned that it suggests a legal duty on the part of the Government to ensure, or at least take "reasonable steps" to ensure, the safe passage of defendants to foreign territories where defendants are wanted by authorities. Defendants argued that this duty exists, but the law does not support this argument. The United States has neither the duty, nor arguably the power, to guarantee "safe" passage, unhindered by the actions of foreign law enforcement agencies, to Americans who are in danger of arrest while travelling in a foreign jurisdic-

tion for the purpose of defending a criminal action. *In re Grand Jury Subpoena of Flanagan,* 691 F.2d 116, 121 (2d Cir.1982); *see also United States v. Sines,* 761 F.2d 1434, 1440 (9th Cir.1985).

The majority also notes that for Sixth Amendment Confrontation Clause purposes, defendants "were effectively prohibited from going to Japan," but seems to reject defendant's argument in part because "the United States government was not responsible for the prohibition." Op. at 428. Once again, there is no basis in law for suggesting the existence of an affirmative duty on the part of the Federal Government in this context. In the very case the majority cites in disposing of the issue, the Ninth Circuit addressed a nearly identical situation where defendant claimed to be faced with a "Hobson's choice": either not attend a deposition being taken in Thailand, where he was wanted by authorities, and forgo exercising his right to confront his adversaries, or show up at the deposition and risk arrest. *Sines,* 761 F.2d at 1441. The court deemed the argument to be "without merit":

> Sines was given the opportunity to attend [the] deposition, and chose not to attend. His decision, whether reasonable or not in light of the possibility that he might be arrested in Thailand ... does not preclude the government from securing [deponent's] testimony.

*Id.* Regardless of the risk of arrest appellants faced in going to Japan, the law regards their decision not to attend the depositions as a "choice," not as a prohibition, and considers their right to confront adverse witnesses therefore to be waived.

Lastly, the majority neglects to address the admissibility of the foreign deposition, to which appellants have objected. As with other decisions regarding the admission of evidence, the District Court's decision to admit a deposition taken abroad is reviewed only for abuse of discretion. *Sines,* 761 F.2d at 1439. Where a witness is incarcerated abroad for a long prison term, he is considered unavailable, and his deposition may be introduced at trial. *Id.* Courts are skeptical of foreign depositions only insofar as

"the manner of examination required by the law of the host nation is so incompatible with our fundamental principles of fairness or so prone to inaccuracy or bias as to render the testimony inherently unreliable."

*United States v. Sturman*, 951 F.2d 1466, 1480 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2964, 119 L.Ed.2d 586 (1992) (quoting *United States v. Salim*, 855 F.2d 944, 953 (2d Cir.1988)). In this case, the Japanese Government agreed to allow the deposition to proceed using American law and procedure. Appellants certainly cannot prevail in arguing that the same deposition procedure which would be used in Ohio is somehow tarnished by its employment on foreign soil, particularly where we have recognized much less comparable foreign procedure as satisfying constitutional minimums. *Id.*

As I have stated, I agree with those parts of the majority opinion I have not mentioned here, but with regard to the points with which I have noted my disagreement, and as to the majority's decision to grant defendants' motion for mistrial, I respectfully **DISSENT.**