36 F.3d 1097
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Lacey Jay FONDREN, Petitioner-Appellant,
v.
Robert E. LECUREUX, Warden, Hiawatha Correctional Facility,
Michigan Department of Corrections, Respondent-Appellee.
 No. 93-1914.
 United States Court of Appeals, Sixth Circuit.
 Sept. 16, 1994.
 
 Before: MARTIN, SUHRHEINRICH, and SILER, Circuit Judges.
 PER CURIAM.
 
 
 1
 Petitioner, Lacey Jay Fondren, appeals from the district court's denial of his petition for a writ of habeas corpus. Fondren asserts that the district court erred in 1) holding that the jurisdiction of the Michigan Court of Appeals under the doctrine of superintending control was a matter of state law not reviewable in a federal habeas petition; 2) determining that the accuracy of the jury instruction was a matter of state law; and 3) holding that the trial court did not unconstitutionally foreclose the possibility of reading back testimony to the jury. For the reasons stated herein, we affirm the decision of the district court.
 
 I.
 
 2
 In 1977, Fondren was convicted in Michigan of first degree felony murder, possession of a firearm in the commission of a felony, and armed robbery. He was sentenced to life in prison without parole on the murder conviction, life with the possibility of parole on the armed robbery conviction, and a mandatory consecutive two-year term on the felony firearm conviction.
 
 
 3
 He and co-defendant, Marshall Terry, were tried at the same time with separate juries. The evidence indicated that Fondren and Terry killed a man and robbed his two housemates. Chester Damiani, one of the three men who lived in the house, testified that strange noises awakened him on the morning of August 9, 1977. As Damiani started downstairs, he was confronted by Fondren and Terry, who were both armed. At some point, Gregory Gavasto, another occupant of the house, awoke and came downstairs. Fondren and Terry demanded both money and goods. After taking some marijuana and cash, Fondren and Terry spotted a police car and fled out the back door. Both Damiani and Gavasto identified Fondren at trial. After Fondren and Terry fled the house, Damiani and Gavasto discovered their housemate, Thomas Nudi, dead on the front porch. Nudi had been shot three times. A calculator was missing from Nudi's pocket; a calculator was later found near the house.
 
 
 4
 Soon after the robbery, Fondren was arrested about two miles from the house and transported to the Lincoln Park Police Department. After arriving at the station, the police officers discovered a .38-caliber revolver stuffed between the cushions in the back seat of the squad car, where Fondren had been. Tests later indicated that one of the bullets removed from Nudi was fired from this gun.
 
 
 5
 At trial, Detective Ackerman testified that Fondren admitted that he went to the house with Terry and, while standing on the porch, saw a man, later identified as Nudi, leave the house and walk off the porch. Fondren heard a shot, fired three times at the man who left the house, and saw that man fall. According to Fondren, Terry then went through the man's pockets. At trial, Fondren admitted making the statement, but denied its truthfulness.
 
 
 6
 Approximately an hour to an hour and a half after the start of its deliberations, the jury submitted a list of seven questions to the judge. The first question requested reinstruction on the difference between first and second degree felony murder. The court read the jury the same instructions as before. As to the other six questions, three inquired about specific factual matters and the other three asked for the testimony of various witnesses[1] to be reread. The court refused to answer any of the six remaining questions, stating:
 
 
 7
 Now Ladies and Gentlemen of the jury, you have submitted additional inquiries and questions. They all have to do with your ability to recall the testimony and evidence that was submitted in the course of this trial. You ... must do your very best to recall that evidence and to recall the testimony that was given in support of those. It will not be possible for the Court to give you answers to the rest of the questions. You will have to do your very best to recall it as you received the testimony. All right, retire the jury.
 
 
 8
 After the jury retired, the court placed the other six questions on the record. Fondren's jury returned with guilty verdicts just over an hour later.
 
 
 9
 Fondren appealed his conviction and sentence raising numerous grounds of error, none of which were the same as the three presented in the present petition. In an unpublished opinion, the Michigan Court of Appeals sua sponte vacated the armed robbery conviction, but denied relief on the grounds raised by Fondren. The Michigan Supreme Court denied leave to appeal.
 
 
 10
 In 1989, six years after the completion of his direct appeals, Fondren filed a delayed motion for a new trial with the Wayne County Circuit Court. This motion raised numerous grounds for relief, including the second and third grounds raised in the current petition. The court granted a new trial, and the prosecution appealed to the Michigan Court of Appeals, which used the doctrine of superintending control to review the decision of the trial court. Superintending control allows the court of appeals to review the lower court's decision only for clear legal error; the appellate court cannot review for simple abuse of discretion. The court of appeals reversed the circuit court and reinstated Fondren's conviction, holding that the jury instructions were correct as matter of state law and that the trial judge did not impermissibly foreclose the possibility of rereading testimony to the jury. The Michigan Supreme Court denied leave to appeal.
 
 
 11
 Fondren filed the instant petition on October 23, 1992, and the district court referred the case to a magistrate judge. The magistrate issued a report and recommendation on May 5, 1993, concluding that both the jurisdiction of the court of appeals and the accuracy of the jury instructions were matters of state law. Because federal courts examining a habeas petition do not review for errors of state law, the magistrate judge concluded that these two issues were not grounds for the issuance of a writ. Even assuming the jury instructions were erroneous, however, the magistrate judge found that the error was not so prejudicial as to deny Fondren a fair trial.
 
 
 12
 In reviewing the third allegation of error, the rereading of testimony to the jury, the magistrate judge stated that
 
 
 13
 [t]he Michigan Court of Appeals held that [the trial judge's] "response did not preclude the jury from requesting the reading of specific witness's testimonies." Counsel for petitioner advances no basis to overturn this presumptively correct finding of the Michigan Court of Appeals.
 
 
 14
 The magistrate judge continued, however, to make an alternate finding. He determined that, assuming the trial court committed constitutional error, the error was harmless and thus could not provide a basis for issuing a writ of habeas corpus. The district court adopted the magistrate judge's recommendation over Fondren's objections.[2]
 
 II.
 
 15
 Fondren argues that the Michigan Court of Appeals violated the Fourteenth Amendment's Due Process Clause when it used an order of superintending control to reverse the trial court's decision to grant a new trial. According to Fondren, the prosecution had no authority to appeal the circuit court's ruling, and the court of appeals had no jurisdiction to review that ruling, as the grant of a new trial is a matter solely within the discretion of the trial court.
 
 
 16
 A federal court may issue a writ of habeas corpus only if a person "is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. Sec. 2254(a). Even if Fondren is correct in arguing that the Michigan Court of Appeals did not comply with Michigan law, the "[m]isapplication of State law, absent invidious discrimination, does not necessarily present a federal constitutional question." Combs v. Tennessee, 530 F.2d 695, 698 (6th Cir.), cert. denied, 425 U.S. 954 (1976). Indeed, we have clearly ruled that errors of state law are "usually not cognizable in federal habeas corpus actions ... [unless] the error rises to the level of depriving the [petitioner] of fundamental fairness." Matlock v. Rose, 731 F.2d 1236, 1242 (6th Cir.1984), cert. denied, 470 U.S. 1050 (1985). See also Estelle v. McGuire, 112 S.Ct. 475, 480 (1991).
 
 
 17
 The jurisdiction of the Michigan Court of Appeals and the application of the doctrine of superintending control is clearly a matter of Michigan state law. Thus, the proper question when reviewing this issue in a habeas petition is whether the alleged error rises to the level of violating the Due Process Clause of the Constitution. As the Supreme Court expressed in reviewing a prisoner civil rights case, "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." Olim v. Wakinekona, 461 U.S. 238, 250 (1983). The substantive interest at stake in a habeas corpus petition is the right to a fundamentally fair trial. Lundy v. Campbell, 888 F.2d 467 (6th Cir.1989), cert. denied, 495 U.S. 950 (1990). Fondren's complaints about the Michigan Court of Appeals' use of an order of superintending control have no relationship to the substantive fairness of his trial. Consequently, we find that Fondren's state law claim raises no due process concerns and is not reviewable in a federal habeas corpus action.
 
 III.
 
 18
 Fondren challenges the jury instructions regarding the crime of murder, contending that the jury's instructions were erroneous and that they unconstitutionally removed the prosecution's burden of proving all essential elements of the crime of felony murder. Fondren specifically contests that portion of the murder instruction concerning the requisite state of mind and instructing that the jury find:
 
 
 19
 [T]hat [the victim's] death was caused by an act of the defendants or because the defendants consciously created a very high degree of risk of death to another with the knowledge that it probably would cause death.
 
 
 20
 Fondren argues that, to convict him of murder, the jury had to find both the act and the necessary intent and that the trial court's use of "or" rather than "and," as well as the use of the plural "defendants," allowed the jury to convict him of murder even if an act of only one of the defendants caused Nudi's death or if only one of the defendants had the requisite state of mind.
 
 
 21
 Fondren concedes that his attorney did not object to the instruction at trial. He notes, however, that his co-defendant's attorney did object to the use of the plural "defendants" as each defendant was being tried by a separate jury and the use of the plural could mislead the jury to wrongfully attribute one defendant's action to the other defendant. The judge denied the objection, stating that the use of "defendants" was not prejudicial to either defendant, especially as the evidence largely related to both men. The court noted that the only crucial difference was Fondren's confession, and Terry's jury was not privy to that information. Fondren argues that this court can review the instruction under the doctrine of plain error and that the instruction was plainly erroneous. Finally, Fondren contends that the doctrine of harmless error does not apply to jury instructions, and even if it does, the instructions did not constitute harmless error.
 
 
 22
 The Michigan Court of Appeals has declared that the jury instruction in question conformed to the state law existing at the time. Fondren raised this allegation of error in his delayed motion for a new trial, which was granted. The Michigan Court of Appeals, however, reversed that decision, declaring:
 
 
 23
 We find as a matter of law that the trial court [in granting Fondren's motion for a new trial] erred in applying People v. Aaron, 409 Mich. 672[, 299 N.W.2d 304,] (1980) retroactively. Prior to the decision in Aaron, malice could be inferred from the nature of the felonious act in a killing committed during the commission of a felony.... Thus, while the instruction given may be violative of the present requirement that malice be individualized as to each defendant, ... this conclusion is not required by the law in effect prior to Aaron. The decision in Aaron is not to be applied retroactively.
 
 
 24
 The Michigan Supreme Court denied leave to appeal. As with Fondren's first claim challenging the state court of appeals use of an order of superintending control, we cannot review this decision of the Michigan Court of Appeals. See Combs, 530 F.2d at 698; Matlock, 731 F.2d at 1242. We do, however, have an obligation to review the instruction in question to see whether it violates any constitutional requirements.
 
 
 25
 The standards for reviewing jury instructions on application for habeas corpus are well-established:
 
 
 26
 The only question for us is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. It is well-established that the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. In addition, in reviewing an ambiguous instruction, ... we inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in way that violates the Constitution. And we also bear in mind our previous admonition that we have defined the category of infractions that violate fundamental fairness very narrowly.
 
 
 27
 Estelle v. McGuire, 112 S.Ct. at 482 (internal citations and quotations omitted).
 
 
 28
 Because of the importance of context in reviewing jury instructions, we will set out the entire instruction regarding murder.
 
 
 29
 Now, the defendants are charged with murder in the first degree. The law as it applies to this case based [sic] that all murder which shall be committed during and as a result of the committing or attempting to commit robbery shall be murder of the first degree. The defendants pled not-guilty. There are two kinds of murder. First degree and second degree. Murder of either degree is the killing of one person by another with malice. Malice is a term with special meaning in the law. Malice means that the defendants intended to kill or that they knowingly created a very high risk or death with knowledge that it probably would result in death and that they did so under circumstances which should not testify [sic], excuse or lessen the crime. First degree and second degree murder are the same crime except that first degree murder has one more element. The additional element is that the death must have occurred as a direct result of the commission of the crime of robbery armed. You will first be instructed of murder in the second degree. Keep in mind that all the elements of second degree murder are necessary to prove first degree murder. To establish second degree murder the Prosecution must prove each of these following elements beyond a reasonable doubt. First, that the deceased died on or about August 9, 1977. Within the County of Wayne and the City of Lincoln Park. Second, that his death was caused by an act of the defendants or because the defendants consciously created a very high degree of risk to another with the knowledge that it probably would cause death.[3] Third, if you find that the death was caused by the defendants you must determine whether the defendants are guilty of any crime. The killing of one being by another may be entirely innocent. It is not the act of killing itself which makes it a crime but the state of mind with which it is done. A killing is not murder if it is justified, excused or mitigated[, or] if it occurs under circumstances which make the killing the lesser crime of manslaughter. Fourth, for murder you must find that the defendants consciously and knowingly performed the act which caused death. The defendants must have either intended to kill[,] that is they must have done the act that resulted in death or in great and serious bodily injury or they must have knowingly created a very high risk of death with the knowledge that it caused death. The degree of risk for murder must be so reckless and wrongful as to amount to a criminal purpose aimed against the person's life and the defendants must have been [conscious] of that risk. For murder of the first degree, the Prosecutor must prove beyond a reasonable doubt the four elements of second degree murder which ... I just gave you, and in addition he must prove beyond a reasonable doubt that fifth element which raises the crime to first degree murder. That element is that at the time of the act which caused the death of Thomas Nudi the defendants were committing or attempting to commit or assisting one another in the commission of the crime of robbery armed.
 
 
 30
 (Emphasis added.) This portion of the charge was read to the jury twice, once before it retired to deliberate and a second time, at the jury's request, about halfway through its deliberation.
 
 
 31
 A reading of the challenged instructions in context eliminates any ambiguity. Even assuming that the instruction was impermissibly ambiguous, we reject Fondren's contention that harmless error analysis is not appropriate with respect to jury instruction and find such error harmless. The Supreme Court has recently articulated the proper harmless error standard for federal courts to use in reviewing applications for a writ of habeas corpus. See Brecht v. Abrahamson, 113 S.Ct. 1710, 1721-22 (1993). In reviewing trial errors, a federal court should determine whether the error had a "substantial and injurious effect or influence in determining the jury's verdict," and the petitioner bears the burden of proving "actual prejudice." Id.
 
 
 32
 The Court in Brecht defined trial error as mistakes which "occur during the presentation of the case to the jury" and which can be "quantitatively assessed in the context of other evidence to determine [the effect they had on the trial.]" Id. at 1717. Trial errors are the opposite of structural errors, which are problems that infect the entire trial process, such as ineffective assistance of counsel. Id. Looking at this definition, jury instruction errors clearly constitute "trial errors." Indeed, we have applied the Brecht harmless error standard to review jury instructions. See O'Neal v. Morris, 3 F.3d 143 (6th Cir.1993), cert. granted, in part, 114 S.Ct. 1396 (1994). Accordingly, a harmless error standard is appropriate in this case.
 
 
 33
 Fondren's jury had ample evidence to support the conclusion that Fondren himself committed the acts which led to the victim's death. Damiani and Gavasto identified Fondren as one of the men who broke into and robbed their house. Immediately after transporting Fondren to the police station, officers found a gun stuffed between the cushions in the back seat of their patrol car. One of the bullets removed from Nudi's corpse was fired from this gun, easily supporting an inference that Fondren fired at least one shot at Nudi. Finally, Detective Ackerman testified that Fondren admitted to firing three shots at Nudi and watching Terry rifle through Nudi's pockets.
 
 
 34
 The evidence presented at trial clearly shows that Fondren engaged in acts which fulfill the required elements for first degree murder. Thus, any ambiguity in the jury instructions was harmless error, and the district court was correct to deny Fondren's petition on this ground.
 
 IV.
 
 35
 Fondren contends that the district court erred in determining that the trial judge did not unconstitutionally foreclose the possibility of reading back testimony to the jury. Fondren concedes that a trial court generally has discretion to determine the extent to which testimony will be read back to the jury. He contends, however, that a trial court cannot foreclose completely the possibility of reading testimony upon the jury's request. Fondren argues that the trial court erred when, in refusing to answer certain of the jury's questions, it failed to tell the jury that the testimony could be read back in the future, should the jury still deem it necessary.
 
 
 36
 Fondren also attacks the magistrate judge's conclusion that the opinion of the Michigan Court of Appeals on this issue is entitled to a presumption of correctness. According to Fondren, this is a mixed question of law and fact, and federal courts should review the issue de novo. Finally, Fondren again argues that instructional errors are not subject to the harmless error analysis. Even if the instructional errors are subject to harmless error, he maintains that the jury sought the testimony of five key witnesses, so denying the request was harmful error.
 
 
 37
 As an initial matter, we note that this court owes no presumption of correctness to the Michigan Court of Appeals' holding. Under 28 U.S.C. Sec. 2254(d), federal courts must give state court findings of fact a presumption of correctness. However, as a practical matter, a court of appeals is not generally a finder of fact, and therefore, it will rarely make factual determinations. Additionally, the court of appeals did not purport to make factual findings, stating that "[w]e hold as a matter of law that this response did not preclude the jury from requesting the reading of specific witness's testimonies," (emphasis added).
 
 
 38
 We have recognized two inherent dangers in reading testimony to a jury during its deliberations. "First, undue emphasis may be accorded such testimony. Second, the limited testimony that is reviewed may be taken out of context by the jury." United States v. Walker, 1 F.3d 423, 430 (6th Cir.1993) (citations omitted). The decision whether to read testimony to the jury during its deliberations is committed to the discretion of the trial court. Id.
 
 
 39
 Such a ruling, like rulings concerning the admissibility of evidence, may not form the basis of federal habeas relief unless a constitutional question is raised. However, if the trial court's error "rises to the level of depriving the defendant of fundamental fairness, the claim is remediable on a petition for habeas corpus relief."
 
 
 40
 Spalla v. Foltz, 788 F.2d 400, 405 (6th Cir.) (citations omitted) (quoting Matlock v. Rose, 731 F.2d at 1242), cert. denied, 479 U.S. 935 (1986). See also United States v. Toney, 440 F.2d 590, 592 (6th Cir.1971) ("When a jury submits questions during its deliberations, it is within the discretion of the trial judge to deny or permit the request.").
 
 
 41
 In Spalla, the trial court did not refuse outright the jury's request for the reading of testimony. Rather, the court urged the jury to deliberate some more and to see if it could reach a conclusion without the testimony. The trial judge stated that if a conclusion could not be reached in a reasonable amount of time, the requested testimony could be transcribed and made available. Id. at 404 n. 1. In holding that this was not fundamentally unfair, we noted two considerations: the requested testimony was neither key to the petitioner's defense nor exculpatory and the trial court's actions did not completely foreclose the possibility of rereading the testimony. Id. at 405.
 
 
 42
 In the present case, the jury requested the testimony of five witnesses. At a minimum, the testimony of Damiani and Gavasto was key because both men identified Fondren as one of the two men who broke into the house. This testimony helped corroborate Fondren's statement, which he later denied, to the police.
 
 
 43
 The trial judge's statements to the jury foreclosed the possibility of the testimony in question being reread. In response to the jury's request as to the reading back of testimony, the judge stated, "It will not be possible for the court to give you answers to the rest of the question. You will have to do your very best to recall it as you received the testimony." He said nothing about the possibility of granting the request later, should the testimony still be required.
 
 
 44
 However, while the trial court's actions may have foreclosed the possibility of having testimony reread, we find that this does not rise to the level of constitutional error. The jury requested that large amounts of testimony--that of five witnesses--be read back after little more than an hour of deliberation. Even though the trial court denied the request, the jury was still able to reach a verdict in approximately another hour to an hour and twenty minutes. This does not suggest that the jury was deadlocked or having trouble.
 
 V.
 
 45
 Finding Petitioner's contentions to be without merit, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 The jury requested that the court reread the testimony of Damiani, Gavasto, and three of their neighbors
 
 
 [2]
 The district court added very little to the magistrate's reasoning, simply stating that Fondren's objections were not well taken because his grounds raised questions of state law, and to the extent that a federal constitutional error might be implicated, Fondren did not establish any influence of the error on the jury's verdict of guilty
 
 
 [3]
 Fondren's claim focusses on this highlighted portion of the jury instructions