[Cite as *State v. Davis*, 2019-Ohio-4692.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                        :

      Plaintiff-Appellee,                    :

                                           No. 18AP-921

v.                                                          :      (C.P.C. No. 17CR-2984)

Ray C. Davis, Jr.,                                 :      (REGULAR CALENDAR)

      Defendant-Appellant.              :

D E C I S I O N

Rendered on November 14, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Brian J. Rigg*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Ray C. Davis, Jr., appeals from the judgment of the Franklin County Court of Common Pleas convicting appellant of aggravated murder, in violation of R.C. 2903.01, aggravated robbery, in violation of R.C. 2911.01, and having a weapon while under disability ("WUD"), in violation of R.C. 2923.13. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} The charges against appellant and his two co-defendants, Devon Kyles and Daiquan Hughes, arise out of the death of the victim, Bryan Woodson, on October 31, 2016. At trial, Woodson's girlfriend, Rita Blackwell, testified that on the evening of October 31, 2016, she was visiting Woodson at his apartment in the Water's Edge apartment complex.

According to Blackwell, when Woodson was walking her to her vehicle later that evening, she and Woodson were approached by three men who asked Woodson for cigarettes and then followed them to her vehicle.

{¶ 3}    After Blackwell left the parking lot, she telephoned Woodson because she felt uneasy about the encounter with the three men.  According to Blackwell, she spoke with Woodson on the phone for a short time before she heard a man once again ask Woodson for a cigarette.  She then heard Woodson respond that he did not have one.  Blackwell described what she next heard over the telephone: "[I]t sounded like there was a scuffle * * * like somebody was attacking him * * *.  Like maybe they was fighting with him."  (Tr. Vol. II at 146-47.)  Blackwell testified that the telephone call abruptly ended and that Woodson did not answer when she called again.  Though Blackwell initially told a detective that Andre Kennedy was one of the three men she had seen that night, Blackwell was later able to identify photographs of two of the three men she had seen that evening, including appellant, from photo arrays shown to her by investigating officers.  At trial, Blackwell identified appellant as the man who had first asked Woodson for a cigarette.

{¶ 4}    Michael Bridges lived in the building across the courtyard from Woodson's in the Water's Edge apartment complex, and he was acquainted with Woodson.  Bridges testified he knew appellant as "C.J."  (Tr. Vol. III at 10.)  Bridges recalled he and appellant had a mutual interest in automobiles, and they even traded cars on occasion.  Bridges had also known appellant's co-defendant, Hughes, for about three months prior to Woodson's murder, and he testified that Hughes went by the name "Dai Dai."  (Tr. Vol. III at 7.)  Both appellant and Hughes lived in a different building in Water's Edge.  Bridges also knew appellant's co-defendant, Kyles, who was a close friend of Hughes, but he did not live at Water's Edge.

{¶ 5}    Bridges testified he was friendly with Woodson, he and Woodson frequently hung out together, and Woodson's apartment was one floor down from his second floor apartment and one apartment to the left.  Bridges stated he was able to clearly see appellant's front door and windows from his terrace window. On October 31, 2016, Bridges was in his apartment with several of his friends and his two roommates.  As Bridges looked out of his sliding glass terrace windows, he could see Hughes and Kyles outside with Woodson "exchanging some words about weed or money, something."  (Tr. Vol. III at 28.)

He noticed that Woodson's apartment door was open and that Woodson was standing outside his front door looking back into his apartment while Hughes and Kyles stood behind him.

{¶ 6}    According to Bridges, he then saw the following events:

> [Woodson] started trying to like walk away real fast, but then he kind of got -- kind of walked trying a faster walk-away. And then I just heard like pop, pop. Two shots. I'm not sure who shot that first time. I don't know if it was [Kyles] or [Hughes] that very first time. But I remember [Woodson] running after the first shot, because there were two shots. After the first shot, [Woodson] got faster after that. Then the second shot, I'm not sure if they hit him or anything, but I remember him falling on the stair that was literally right outside my patio.

 (Tr. Vol. III at 30.)

{¶ 7}    According to Bridges, as Woodson was trying to crawl up the exterior stairway, Hughes and Kyles followed and Hughes began hitting Woodson with a liquor bottle. Hughes then began going through Woodson's pockets while continuing to ask Woodson: "Where the weed? Where the money at?" (Tr. Vol. III at 31.) Bridges testified after Hughes searched Woodson's pockets, Hughes and Kyles walked back down the stairway and out of sight. When Woodson made eye contact with Bridges through Bridges' window, Woodson told Bridges "[t]hey shot me, they shot me. Help me." (Tr. Vol. III at 32.) Bridges told Woodson to "hold on" while Bridges called police. (Tr. Vol. III at 32.)

{¶ 8}    At or about the time Bridges was calling the police, he saw Hughes do the following while Kyles remained at the bottom of the stairs:

> I seen [Hughes] come back up the stairs with a gun in his hand, and he was like -- no words, no nothing, and just shot immediately into [Woodson's] head over and over and over and over and over. And then he kind of like looked at him and he walked away. Then they went down the stairs. And I seen C.J. there at the bottom of the stairs, kind of telling him to get back up there. I'm not sure what he gave him or anything, but whatever was given, they came back where they were able to shoot again. And he was able to empty the rest of those into [Woodson's] head that time again.

(Tr. Vol. III at 33.)

{¶ 9} According to the coroner, Woodson sustained fourteen or fifteen gunshot wounds over his entire body, including six to his head. Woodson also had an abrasion on the left side of his head and a cut near his left ear.

{¶ 10} Carolyn Davidson was a resident of Water's Edge on the day of the shooting. She has since moved away. Davidson testified that she and a neighbor, Victoria Moore, were standing in front of Moore's apartment at around 10:00 p.m. when they heard multiple gunshots. Davidson testified she and Moore walked to the corner of Moore's building to look in the direction of the gunshots. Davidson saw two young men running through the parking lot from the direction where the gunshots were fired and towards the rental office. She stated that a short time later she saw the same two men run back through the parking lot towards the area where the first gunshots rang out. According to Davidson, she heard several more gunshots and then saw the two men run back through the parking lot toward the rental office. Davidson could see the two men reasonably well due to the lights shining from the parking lot and the adjacent apartment buildings, and she was able to describe the two individuals, including their clothing.

{¶ 11} Davidson testified a short time after the two men returned to the rental office location for the second time, one of the men went back to the area where she heard the gunshots just before Davidson heard a third set of gunshots. Davidson testified when she heard sirens, she and Moore walked over to the area where the gunshots had been fired and saw a male victim laying on the ground at the entrance to the exterior stairway. Davidson described the scene as "chaotic" as police cordoned off the courtyard and parking lot. (Tr. Vol. III at 94.)

{¶ 12} Davidson approached a police officer away from the scene and told the officer she had seen something. The officer put Davidson in a police car, where she waited for about one-half hour before the officer returned to take her statement and get her contact information. According to Davidson, while she was sitting in the police car waiting for the officer to return, she received a call from Moore who informed her that appellant, whom Davidson knew as C.J., was standing behind the police car with another man. When Davidson asked Moore if appellant knew she was in the police car, Moore told her he did not.

{¶ 13} Moore testified there is "[a] lot of crime. A lot of drugs" at Water's Edge. (Tr. Vol. III at 116.) Because Moore still lives at Water's Edge, she was apprehensive about cooperating with police and giving testimony in this matter for fear of retaliation. On the night in question, Moore was at home when she heard "two shots and * * * a lady scream." (Tr. Vol. III at 120.) When she opened her door, she saw Davidson who had also heard the shots. According to Moore, she heard four more shots and then saw two men, whom she did not recognize, running toward appellant's apartment. Moore stated appellant and his girlfriend lived in an apartment near the rental office. She acknowledged that her vantage point did not allow her to see the men enter appellant's apartment. Moore then saw the two men reappear, "[n]ot too long after," and run back to the area where she had initially heard the gunshots. (Tr. Vol. III at 129.) Moore heard more gunshots and then saw the two men running back towards appellant's apartment. After a short time, the men ran back again to the area where she heard the gunshots. Moore then heard more gunshots before the men ran off. In total, Moore recalled hearing "like a total of 18 shots." (Tr. Vol. III at 120.)

{¶ 14} Using aerial maps and photographs of the Water's Edge apartment complex, Moore pointed out and described to the jurors the area where the incident took place, including her apartment, Davidson's apartment, the apartment where appellant lived, and the area where the shooting occurred. She also showed the jurors her viewpoint on the night in question and described how the area was illuminated.

{¶ 15} According to Moore, after the incident, appellant approached her as she spoke with Davidson and struck up a conversation. She said appellant first appeared saddened by the incident and described Woodson as "his best friend." (Tr. Vol. III at 132.) Appellant then launched into a discussion about his girlfriend being jealous because he was sleeping with a rental agent at the complex. Moore testified appellant's demeanor "just didn't look right," and she surmised he was not genuinely troubled by Woodson's death. (Tr. Vol. III at 133.) Moore did not talk to police until later that night, but when she saw Davidson seated in a police cruiser, she called Davidson's cellular telephone to alert her that appellant "was out there by the cruiser." (Tr. Vol. III at 133.)

{¶ 16} On October 31, 2016, Tyrone Blake and his cousins lived in an apartment with Bridges at Water's Edge. On that evening, several friends were at the apartment playing

video games. He testified he knew Hughes and Kyles, and they occasionally came over to play video games. He knew appellant as C.J., and he testified appellant was a maintenance worker at the complex. He first became aware of an incident involving Woodson when he heard gunshots and then heard Woodson screaming for help. Blake described what he saw when he looked out the apartment window:

> [W]e just seen [Woodson] on the ground, screaming for help. They shot me. And then that's when [Hughes] and [Kyles] came up the steps and they started beating him up. And they started going in his pockets. And he said, I ain't got nothing in my pockets, I ain't got nothing, I ain't got nothing. That's when they run down the steps to C.J.'s place.

(Tr. Vol. III at 158-59.)

{¶ 17} According to Blake, he saw Hughes beating Woodson with a bottle while Kyles was "punching on him, trying to go into his pockets." (Tr. Vol. III at 162.) Blake stated: "We got on the phone and called the police." (Tr. Vol. III at 165.) Blake said Hughes and Kyles came back a short time later, and Hughes began shooting Woodson in his head and body. Blake testified he saw Hughes and Kyles run back to appellant's apartment before returning a third time to shoot Woodson. Blake stated Woodson was still alive at that point in time. According to Blake, the third time Hughes came back, he "fired the whole clip" into Woodson's head. (Tr. Vol. III at 170.) Blake could see appellant at the bottom of the exterior stairwell, from the waist up, as Hughes fired the third set of shots.

{¶ 18} On June 1, 2017, a Franklin County Grand Jury indicted appellant on numerous charges, including two counts of aggravated murder, in violation of R.C. 2903.01, an unclassified felony; two counts of murder, in violation of R.C. 2903.02, an unclassified felony; aggravated robbery, in violation of R.C. 2911.01, a first-degree felony; intimidation of a witness, in violation of R.C. 2921.04, a third-degree felony; and WUD, in violation of R.C. 2923.13, a third-degree felony. Each of the unclassified felony charges and first-degree felony charges were accompanied by three-year firearm specifications and repeat violent offender specifications ("RVO"). Kyles and Hughes were indicted on similar charges.

{¶ 19} A jury found appellant guilty of every charge and specification, except the charge of witness intimidation. Appellant elected a bench trial on the charge of having a WUD charge, and the trial court found appellant guilty of the WUD charge. The trial court also found appellant guilty of the RVO specifications.

{¶ 20} Following a September 24, 2018 sentencing hearing, the trial court found the two counts charging appellant with aggravated murder and the two counts charging appellant with murder merged for purposes of sentencing. Plaintiff-appellee, State of Ohio, elected to seek sentencing on Count 1, charging appellant with aggravated murder.

{¶ 21} On November 2, 2018, the trial court issued a judgment entry imposing a prison term of 30 years to life for aggravated murder, consecutive to a 3-year term for the firearm specification. The trial court also sentenced appellant to 8 years in prison for aggravated robbery and 3 years for the WUD charge, to be served concurrently with the prison term imposed on Count 1, for an aggregate prison term of 33 years to life.[1]

{¶ 22} Appellant timely appealed to this court from the judgment of the trial court.

## II. ASSIGNMENTS OF ERROR

{¶ 23} Appellant assigns the following as trial court error:

> 1. THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANT'S MOTIONS FOR A NEW JURY POOL OR DECLARATION OF A MISTRIAL.
>
> 2. THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT-APPELLANTS [sic] R. 29 MOTION FOR ACQUITTAL.
>
> 3. THE VERDICTS OF GUILTY TO AGGRAVATED MURDER, MURDER, AND AGGRAVATED ROBBERY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. LEGAL ANALYSIS

### A. Appellant's First Assignment of Error

{¶ 24} In appellant's first assignment of error, appellant argues the trial court abused its discretion when it refused to either declare a mistrial or seat a new jury after appellant's two co-defendants unexpectedly resolved their cases following jury selection. We disagree.

{¶ 25} The record shows that shortly after the jury was seated, appellant's co-defendant, Kyles, entered a guilty plea. The remaining parties and their counsel entered into a discussion with the trial court regarding the instruction the trial court should give to the jury regarding Kyles' absence from the proceedings. Appellant's trial counsel asked that

---

[1] The trial court did not impose a sentence for the RVO specifications.

any instruction given by the trial court should inform the jury that Kyles had pleaded guilty.[2] Additionally, appellant's trial counsel made the following argument:

> Actually, Your Honor, we're not asking for a mistrial. Instead, we would ask for the panel to be excused and for a new panel to be voir dired. Based on the U.S. Constitution's right to a trial, a jury that is fair and impartial, the right to due process, I don't believe that any curative instruction would cure the taint in the minds of the jury that's created by the absence of Mr. Kyles or a statement from the court that his case has been resolved.

> They've had voir dire from all three attorneys. In going forward, there will be two co-defendants, two sets of defense counsel. I don't believe that a curative instruction or a jury instruction is sufficient to have an actual impartial jury. I believe that due process and the Sixth Amendment would demand that we have the chance to impanel a new jury, Your Honor.

(Tr. Vol. II at 13-14.)

{¶ 26} The trial court denied appellant's request to seat a new jury and, instead, gave the jury the following instruction:

> Now, you [no] doubt noticed that Ms. Kurila is not here and Mr. Kyles is not here. Their part of this case was resolved earlier this morning, so Ms. Kurila will not be participating in the trial and Mr. Kyles will not be presenting evidence or participating in the trial or have you render a verdict on his case.

> You're advised that you must not consider the fact that Mr. Kyles has resolved his case as any evidence against either [appellant] or Mr. Hughes. They are still presumed innocent. The fact that one of the defendants resolved their case doesn't mean anything about the innocence or guilt or anything else of the other two gentlemen. So set it aside that at one point in this trial, Mr. Kyles was also on trial.

> Now, we have two defendants. It's still a very important case, and you have to evaluate the evidence against both defendants separately. And there are some separate claims against each of them, and you'll have to examine each claim, each charge against them separately. Is everybody clear on that? All right.

(Tr. Vol. II at 17-18.)

---

[2]Hughes' trial counsel asked the trial court to refrain from telling the jury Kyles had pleaded guilty.

{¶ 27} Following the testimony of appellee's first witness, Officer Derek Blaine of the Columbus Division of Police, Hughes also pleaded guilty. Thereupon, the trial court instructed the jury as follows:

> Members of the jury, as you can see, Mr. Hughes and his counsel have left the case. Their part of the case has been resolved, and that's the reason we're late starting here coming back. The balance of the case goes forward against [appellant]. He is still entitled to the presumption of innocence. And as I told you this morning, there's nothing about the change in the structure of the case and the elimination of the two co-defendants that is evidence that [appellant] broke the law in any respect. So please keep that in mind as you hear the evidence this afternoon.

(Tr. Vol. II at 78.)

{¶ 28} To the extent appellant's objection at trial preserved appellant's claim that the trial court should have granted a mistrial, we note that the decision whether to grant a mistrial rests in a trial court's sound discretion. *State v. Oteng*, 10th Dist. No. 14AP-466, 2015-Ohio-1231, ¶ 26, citing *State v. Jones*, 10th Dist. No. 12AP-1091, 2014-Ohio-674, ¶ 10; *State v. Glover*, 35 Ohio St.3d 18 (1988). A reviewing court may not substitute its judgment for that of the trial court absent an abuse of discretion. *Oteng* at ¶ 26, citing *State v. Bruce*, 10th Dist. No. 07AP-355, 2008-Ohio-4370, ¶ 75. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "This standard is based upon the notion that the trial court is in the best position to determine whether the circumstances of the case necessitate the declaration of a mistrial or whether other corrective measures are adequate." *Oteng* at ¶ 26, citing *Bruce* at ¶ 75. "A mistrial should be granted only where the party seeking it demonstrates that he or she suffered material prejudice so that a fair trial is no longer possible." *Oteng* at ¶ 26, citing *Bruce* at ¶ 75, citing *State v. Franklin*, 62 Ohio St.3d 118 (1991).

{¶ 29} In our view, the curative instructions given by the trial court were sufficient to correct any potential prejudice to appellant arising out of the early exit of the two co-defendants. In reaching this conclusion, we note that a similar trial court instruction was found to be sufficient by the Sixth Circuit Court of Appeals in *United States v. Walker*, 1 F.3d 423 (6th Cir.1993).

{¶ 30} In *Walker*, jury selection was ongoing when one of the four co-defendants entered a guilty plea and agreed to testify for the government. The other three defendants, including Walker, moved the court to sever the trials and dismiss the venire. Later in the day, one of the three remaining co-defendants pleaded guilty. The next morning, the district court denied the motion to dismiss the venire and gave the following instruction to the jurors:

> You will see by looking at counsel table for the defendants that there are now two defendants rather than four, two lawyers representing their respective clients, there are therefore three less lawyers at the table representing two defendants. Let me advise you right now, I will advise those of you who are seated as jurors in the case, that you are not to draw any inference from that. It is a matter that does not concern you at all and you are not to draw any inference.

*Id.* at 428.

{¶ 31} In his appeal to the Sixth Circuit, Walker argued the district court erred when it denied the motion for severance and motion to dismiss the jury venire after the co-defendants pleaded guilty during the jury selection process. The Sixth Circuit stated that "[w]e find no error in the procedure used by the court" and rejected Walker's argument. *Id.*

{¶ 32} In a subsequent decision in *United States v. Gray*, N.D.Ohio No. 1:04-CR-580 (Nov. 15, 2005), the district court relied on the *Walker* case in denying a motion for mistrial made by Gray after a co-defendant pleaded guilty on the second day of trial. In holding that a mistrial was not required, the court stated:

> Gray argues that Jones' guilty plea two days into the trial necessitated a mistrial. [Doc. 509 at 21]. The Court disagrees. The power to order a mistrial "ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes . . . ." *Arizona v. Washington,* 434 U.S. 497, 506, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978) (citation omitted). A codefendant's guilty plea during trial does not necessarily require a mistrial. *See United States v. Walker,* 1 F.3d 423, 428 (6th Cir. 1993) (affirming denial of motion for mistrial where codefendants pled guilty during trial). As in *Walker,* the Court instructed the jury during the trial that Jones was no longer part of the case. [Tr. at 753-754]. During the jury charge, the Court further instructed the jury "that whether any other person or entity should be prosecuted or convicted of a crime is not a proper matter for you to consider," and "do not let the possible guilt of others influence

your decision in any way." [Tr. at 1754, 1755]. * * * The Court presumes that the jurors were capable of following the Court's instructions and properly evaluating the evidence against the remaining defendants. *See United States v. Warner,* 690 F.2d 545, 553 (6th Cir. 1982).

*Id.*

{¶ 33} The instructions given by the trial court in this case were in line with the instruction given by the district court in *Gray* and the instruction approved by the Sixth Circuit in *Walker.* After Kyles pleaded guilty, the trial court advised the jury: "[Y]ou must not consider the fact that Mr. Kyles has resolved his case as any evidence against either [appellant] and Mr. Hughes. They are still presumed innocent. The fact that one of the defendants resolved their case doesn't mean anything about the innocence or guilt or anything else of the other two gentlemen. So set it aside that at one point in this trial, Mr. Kyles was also on trial." (Tr. Vol. II at 17.) Following Hughes' plea, the trial court instructed the jurors that appellant was "still entitled to the presumption of innocence." (Tr. Vol. II at 78.) The trial court also reminded the jurors: "[A]s I told you this morning, there's nothing about the change in the structure of the case and the elimination of the two co-defendants that is evidence that [appellant] broke the law in any respect." (Tr. Vol. II at 78.)

{¶ 34} "Curative instructions are presumed to be an effective way to remedy errors that occur during trial." *State v. Brown*, 10th Dist. No. 15AP-935, 2016-Ohio-7944, ¶ 21, citing *State v. Treesh*, 90 Ohio St.3d 460, 480 (2001). "As an appellate court, we must presume that the jury followed the trial court's instructions." *Brown* at ¶ 18, citing *State v. Walburg*, 10th Dist. No. 10AP-1087, 2011-Ohio-4762, ¶ 53, citing *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, ¶ 39. In our view, the curative instructions given by the trial court in this case were sufficient to ameliorate any risk of jury impartiality that may have arisen from the pleas entered by appellant's co-defendants, and we perceive no unfair prejudice to appellant arising out of the procedure employed by the trial court. Accordingly, we hold the trial court did not abuse its discretion when it denied appellant's request for a new venire and a mistrial.

{¶ 35} For the foregoing reasons, appellant's first assignment of error is overruled.

**B. Appellant's Second and Third Assignments of Error**

{¶ 36} Because appellant's second and third assignments of error ask us to critically examine the evidence of appellant's guilt, we will consider them together. In appellant's

second assignment of error, appellant argues the trial court erred when it denied his Crim.R. 29 motion for acquittal because the evidence presented by appellee was insufficient to support a guilty verdict beyond a reasonable doubt.  In his third assignment of error, appellant argues alternatively that the verdicts were against the manifest weight of the evidence.

{¶ 37}  "Because a Crim.R. 29 motion questions the sufficiency of the evidence, we apply the same standard of review on appeal as in a challenge to the sufficiency of the evidence."  *State v. Guy*, 10th Dist. No. 17AP-322, 2018-Ohio-4836, ¶ 40, citing *State v. Kearns*, 10th Dist. No. 15AP-244, 2016-Ohio-5941, ¶ 44.  "Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict."  *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).  "Whether the evidence is legally sufficient to support a verdict is a question of law, not fact."  *State v. Cervantes*, 10th Dist. No. 18AP-505, 2019-Ohio-1373, ¶ 24, citing *Kurtz* at ¶ 15, citing *Thompkins* at 386.  "In determining whether the evidence is legally sufficient to support a conviction, ' "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' "  *Cervantes* at ¶ 24, quoting *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 38}  "In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction."  *Kurtz* at ¶ 16, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80.  The court essentially assumes the state's witnesses testified truthfully and determines whether that testimony satisfies each element of the crime.  *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4.  "Further, 'the testimony of one witness, if believed by the jury, is enough to support a conviction.' "  *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 33, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42.

{¶ 39}  "Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence."  *State v. McCombs*, 10th Dist. No. 15AP-245, 2015-Ohio-3848, ¶ 3, citing *Thompkins* at 387.  "While sufficiency of

the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38.

{¶ 40} "When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Patterson* at ¶ 34, citing *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most ' "exceptional case in which the evidence weighs heavily against the conviction." ' " *Cervantes* at ¶ 27, quoting *Thompkins* at 387, quoting *Martin* at 175.

{¶ 41} "In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses." *Cervantes* at ¶ 28, citing *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. "However, in conducting such review, 'we are guided by the presumption that the jury, or the trial court in a bench trial, "is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." ' " *Cervantes* at ¶ 28, quoting *Cattledge* at ¶ 6, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *discretionary appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7. Similarly, "the presence of conflicting evidence does not render a verdict against the manifest weight of the evidence." *State v. Morris*, 10th Dist. No. 18AP-208, 2018-Ohio-5252, ¶ 51, citing *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43, citing *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21. "[A] conviction is not against the manifest weight of

the evidence merely because the trier of fact believed the state's version of events over the defendant's version." *Morris* at ¶ 51, citing *Lindsey* at ¶ 43, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19.

{¶ 42} Appellant contends that appellee failed to present sufficient evidence to prove, beyond a reasonable doubt, that appellant purposely, and with prior calculation and design, caused Woodson's death as required for a conviction of aggravated murder under R.C. 2903.01(A) and failed to produce sufficient evidence to support a finding, beyond a reasonable doubt, that appellant caused Woodson's death while committing or attempting to commit aggravated robbery, as required for a conviction of aggravated murder under R.C. 2903.01(B). We disagree.

{¶ 43} R.C. 2903.01 defines the offense of aggravated murder, in relevant part, as follows:

> (A) No person shall *purposely, and with prior calculation and design*, cause the death of another or the unlawful termination of another's pregnancy.
>
> (B) No person shall *purposely cause the death of another* * * * *while committing or attempting to commit*, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, *aggravated robbery*, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape.

(Emphasis added.)

{¶ 44} The Supreme Court of Ohio has stated that "there is 'no bright-line test that emphatically distinguishes between the presence or absence of "prior calculation and design," [and that] each case turns on the particular facts and evidence presented at trial.' " *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, ¶ 19, quoting *State v. Taylor*, 78 Ohio St.3d 15, 20 (1997). "Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Cotton*, 56 Ohio St.2d 8 (1978), paragraph three of the syllabus.

{¶ 45} R.C. 2923.03(A) defines the offense of complicity, in relevant part, as follows:

No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

* * *

(2) Aid or abet another in committing the offense.

{¶ 46} In *State v. Williams*, 10th Dist. No. 03AP-4, 2003-Ohio-7160, this court advised that "[a] jury can convict on circumstantial evidence alone."  Moreover, the circumstantial evidence does not have to exclude "every reasonable hypotheses except that of guilt."  *Id.* at ¶ 34, citing *State v. Lott*, 51 Ohio St.3d 160 (1990) (convicting defendant of aggravated murder solely on circumstantial evidence).  In *Williams*, we stated that " '[w]hile inferences cannot be built on inferences, several conclusions can be drawn from the same set of facts; and a series of facts and circumstances can be used as a basis for ultimate findings.' "  *Id.* at ¶ 34*,* quoting *Lott* at 168.

{¶ 47} Contrary to appellant's assertion, the testimony of appellee's witnesses was sufficient to prove each of the elements of aggravated murder, beyond a reasonable doubt, as the offense is defined both in R.C. 2903.01(A) and (B).  In our view, Bridges' testimony alone, if believed, supports appellant's guilt, beyond a reasonable doubt, as an accomplice of Hughes and Kyles in committing aggravated murder, murder, and aggravated robbery.[3]

{¶ 48} Bridges testified while looking out his apartment window, he saw Hughes striking appellant with a liquor bottle as Woodson lay on the concrete landing just outside his apartment door.  Bridges testified he saw Hughes going into Woodson's pockets while asking Woodson about the location of money and drugs.  Bridges told the jury that he saw Hughes and Kyles run down the stairway and towards appellant's apartment after Hughes searched Woodson's pockets.  Bridges also testified after Hughes returned to fire a second set of gunshots into Woodson's head and body, he and Kyles ran back down the exterior stairway where they met appellant who was waiting at the bottom of the stairs.  Bridges saw appellant, from roughly 35 feet away, hand something to Hughes and gesture for Hughes

---

[3] R.C. 2903.02 defines the offense of murder in relevant part as follows: "(A) No person shall purposely cause the death of another * * *.  (B) No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree."  Aggravated robbery is defined in R.C. 2911.01(A), in relevant part, as follows: "No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following: (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it."

to head back up the stairs. After briefly meeting with appellant, Hughes came back up the stairway and fired more gunshots directly into Woodson's head as Woodson lay on the concrete landing just outside Bridges' apartment door. Bridges testified the victim knew all three of his assailants, the murder took place in the apartment complex where appellant and the victim both lived, and the murder and robbery was a drawn out and brutal affair rather than an instantaneous eruption of events.

{¶ 49} Based on Bridges' testimony, it was reasonable for the jury to infer appellant aided and abetted Hughes in purposefully causing the death of Woodson, both with prior calculation and design and while attempting to commit aggravated robbery. Appellant argues, however, that appellee's evidence merely establishes his presence at the scene of the crimes which is insufficient to support a finding that he aided Hughes and Kyles in the commission of the crimes.

{¶ 50} In *State v. Williams*, 10th Dist. No. 15AP-48, 2016-Ohio-4550, we noted the trial court correctly instructed the jury on the law of complicity by stating that "mere presence can be enough if it is intended to and does aid" the primary offender. *Id.* at ¶ 77-81. *See also State v. McDonald-Glasco*, 10th Dist. No. 17AP-368, 2018-Ohio-1918, ¶ 31-34 (the instruction "mere presence can be enough if it is intended to and does aid the primary offender" is an accurate statement of the law and adequately informs the jury on complicity); *State v. Word*, 10th Dist. No. 17AP-367, 2019-Ohio-1733, ¶ 33 ("trial court properly instructed the jury on complicity and the trial court did not abuse its discretion in denying Word's request for the additional language he sought related to 'mere presence' ").

{¶ 51} Here, Bridges' testimony, if believed, establishes appellant did more than simply stand at the bottom of the stairs while Hughes and Kyles robbed and murdered Woodson. According to Bridges, after Hughes fired the second set of gunshots to Woodson's head and body, he saw the following: "I seen C.J. there at the bottom of the stairs, kind of telling him to get back up there. I'm not sure what he gave him or anything, but whatever was given, they came back where they were able to shoot again. And he was able to empty the rest of those into [Woodson's] head that time again." (Tr. Vol. III at 33.)

{¶ 52} Bridges' testimony, if believed, permits an inference that appellant's presence at the scene as well as his conduct as related by Bridges supports a finding, beyond a reasonable doubt, that appellant aided Hughes and Kyles in the commission of the

aggravated murder and attempted aggravated robbery of Woodson. Specifically, Bridges' testimony shows that appellant both aided and encouraged Hughes and Kyles in the commission of the crimes. Accordingly, we hold the evidence presented by appellee was sufficient to sustain appellant's guilt as an accomplice of Kyles and Hughes and that the trial court did not err when it denied appellant's Crim.R. 29 motion for acquittal.

{¶ 53} Having determined the testimony of appellee's witnesses was sufficient to establish the elements of aggravated murder, as defined in R.C. 2903.01(A) and (B), we hold the testimony presented by appellee was also sufficient to establish appellant purposefully caused the death of Woodson for purposes of the offense of murder, as defined in R.C. 2903.02.

{¶ 54} Additionally, with regard to the finding of guilt by the trial court of the offense of WUD under R.C. 2923.13(A)(2), both Bridges and Blake witnessed Hughes shoot Woodson multiple times with a firearm, and evidence was presented to the trial court of appellant's prior burglary conviction in Arkansas. Similarly, the testimonies of Bridges and Blake supported the conviction of the firearm specification under R.C. 2941.145(A). Thus, the trial court's finding of guilt as to these offenses is supported by sufficient evidence.

{¶ 55} To the extent appellant's sufficiency argument raises issues of witness credibility and alleged inconsistencies in the testimony of appellant's witnesses, we will consider those arguments in connection with appellant's manifest weight argument. *See Yarbrough*, 2002-Ohio-2126, at ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence). *See also Bankston*, 2009-Ohio-754, at ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime").

{¶ 56} Appellant's manifest weight argument focuses on alleged inconsistencies in the testimony of appellee's witnesses, Moore and Davidson, and allegedly conflicting accounts of the events as seen by Bridges and Blake. Appellant also claims that Blackwell changed her story regarding the identity of the third man she observed as Woodson escorted her to her vehicle.

{¶ 57} Our review of the evidence shows Bridges' testimony as to what he saw outside of his apartment window was largely corroborated by Blake. Consistent with

Bridges, Blake testified after the first shots were fired, Hughes and Kyles ran back toward appellant's apartment. Blake also agreed with Bridges' testimony that he saw appellant at the bottom of the stairs when Hughes fired the third set of gunshots into Woodson's head as he lay on the concrete landing above. Though Blake acknowledged that he only got a glimpse of appellant from the waist up, Blake was acquainted with appellant, he knew what appellant looked like, and he testified it was appellant who was at the bottom of the stairs when Hughes fired the third set of gunshots into Woodson's head.

{¶ 58} In our view, the fact that Bridges did not mention appellant's name to police until later in the investigation, and after Bridges' pending criminal proceedings were resolved, can be explained by his admission that he was initially reluctant to name appellant due to fear of being "labeled a snitch." (Tr. Vol. III at 77.) Bridges also testified he overheard appellant making a threat against another prospective witness, Andre Kennedy, who had been at Bridges' apartment on the night of the murder.[4] We also note the jury was made aware of Bridges' pending criminal proceedings and the resolution of the charges.

{¶ 59} Davidson and Moore each testified they saw two men run towards appellant's apartment from the area where the first shots were fired. A short time later, the two men ran back to the scene before Davidson and Moore heard a second set of gunshots. Though Davidson's and Moore's view of appellant's apartment door was obstructed, both testified the two men ran toward the apartment near the rental office where appellant lived with his girlfriend. Appellant argues that Davidson's and Moore's accounts of what they saw differed to the extent that neither witness could be considered credible. We disagree.

{¶ 60} While we acknowledge the testimony from Davidson and Moore differed with respect to the type of obstructions that blocked their view of the entrance to appellant's apartment and the extent of lighting in the area, in our view, the discrepancies in the accounts of these witnesses were relatively minor in comparison to the facts on which they agreed. Finally, while Blackwell's testimony established the events that occurred prior to the crimes, her testimony was not necessary to establish the elements of the offenses for which the jury and the trial court found appellant guilty. Moreover, during her testimony,

---

[4]The parties stipulated that "[o]n November 26th, 2016, at 3:10 p.m., Tyrone Blake, Michael Bridges, and Andre Kennedy made a police report regarding a threat they received from [appellant] who was with Daiquan Hughes at the time. They reported that the threat occurred at 4611 Refugee Road, Apartment 2C." (Tr. Vol. III at 217.)

she explained she did not know the names of the three men who approached her and Woodson prior to the murder.  Accordingly, even though Blackwell admitted that she may have told an officer that Andre Kennedy was one of the three individuals, she explained to the jury how she may have been confused by viewing a "Facebook page."  (Tr. Vol. III at 167.)  She was also able to select appellant's photograph out of a photo array as one of the men who approached her and Woodson just prior to the murder.

{¶ 61}  In the final analysis, our review of the entire record reveals that the weight of the evidence supports appellant's conviction of two counts of aggravated murder, two counts of murder, aggravated robbery, WUD, and both the firearm and RVO specifications. The trier of fact in this case, whether it be the jury or the trial court, did not lose its way and create a manifest injustice in finding appellant guilty.  Accordingly, appellant's second and third assignments of error are overruled.[5]

## IV.  CONCLUSION

{¶ 62}  Having overruled appellant's three assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Motion to strike granted*;
*judgment affirmed.*

BRUNNER and NELSON, JJ., concur.

_____

---

[5] For good cause shown, appellee's motion to strike appellant's pro se "letters" is granted.